Christopher COLLINS, et al., Appellants,

v.

Casper WEINBERGER, Secretary
of Defense, et al.

No. 82–1857.

United States Court of Appeals,
District of Columbia Circuit.

Argued 15 March 1983.

Decided 17 May 1983.

Mitchell J. Notis, Washington, D.C., with
whom James R. Rosa, Washington, D.C.,
was on the brief for appellants.

Debra A. Valentine, Atty. U.S. Dept. of
Justice, Washington, D.C., with whom Lar-
ry L. Simms, Deputy Asst. Atty. Gen., U.S.
Dept. of Justice, Washington, D.C., was on
the brief for appellees.

Before TAMM and WILKEY,. Circuit
Judges, and GORDON,* United States Sen-
ior District Judge for the Western District
of Kentucky.

Opinion for the Court filed by Circuit
Judge WILKEY.

WILKEY, Circuit Judge:

Appellants are one former and two
present employees of the U.S. Army and
Air Force Exchange Service in the Federal
Republic of Germany (FRG). They claim
that in a 1975 reduction in force they were
discriminated against because of their
American citizenship pursuant to United
States Army, Europe (USAREUR) Regula-
tion 690–84,[1] which provides preferential
protections against dismissal for certain
local nationals of the FRG. Appellants al-
lege that Regulation 690–84 violates Sec-

---

* Sitting by designation pursuant to Title 28
U.S.C. § 294(d).

1. USAREUR Regulation 690–84 (1974), *reprint-
ed in* Joint Appendix (JA) at 146–182.

tion 106 of Pub.L. No. 92–129 (Section 106),[2] which prohibits discrimination in employment against United States citizens or the dependents of members of the Armed Forces at military facilities overseas unless such discrimination is permitted by a treaty between the United States and the host country. On cross motions for summary judgment the district court held for the government, finding that Regulation 690–84 is insulated from the prohibition of Section 106 because it merely implements and clarifies a pre-existing treaty obligation. This appeal followed, and we now affirm.

## I. BACKGROUND

The duties and privileges of the various NATO countries which station armed forces in the FRG are governed by two treaties: a general NATO Status of Forces Agreement (NATO/SOFA)[3] and a Supplementary Agreement specifically applicable to the FRG.[4] These agreements distinguish three categories of employees of a "sending state" at NATO bases in the FRG (the "receiving state"). First, there are military personnel with official duties in the receiving state.[5] Second, there is a "civilian component" consisting of civilian personnel accompanying and employed by the sending state's force who are neither "stateless persons nor nationals of any state which is not a party to the North Atlantic Treaty, nor nationals of, nor ordinarily resident in, the state in which the force is located."[6] And third, there are local nationals; that is, individuals who normally reside in the receiving state.[7]

Both the military personnel and the civilian component of a sending state are governed by the laws, regulations and personnel rules of the sending state.[8] They are exempt from various FRG laws requiring work permits and alien registration, and imposing income taxes, custom duties, social insurance and wage scales. The conditions of employment of local nationals, on the other hand, are governed by the labor laws of the receiving state.[9]

In 1971 USAREUR instituted a Dependent Hire Program designed to improve job opportunities for dependents of U.S. military and civilian personnel stationed in Europe. These dependents received jobs traditionally reserved for local nationals. As a result, the number of dependents employed by USAREUR increased dramatically while the number of local national employees declined. Labor shortages in the FRG forestalled any complaint with the new policy. But as German economic growth slowed, local nationals became increasingly concerned with their job security. Complaints were made to the German parliament, and complicated negotiations between the two governments ensued.[10]

The focus of the negotiations was on the status of dependents under NATO/SOFA and the Supplementary Agreement. The FRG maintained that since USAREUR was hiring these dependents in the FRG to fill local labor requirements they were, like local nationals, subject to German law, including the German work permit require-

2. 5 U.S.C. § 7201 note (Supp. V 1981).

3. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces (*hereinafter cited as* NATO/SOFA), 19 June 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846.

4. Agreement to Supplement the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces with Respect to Foreign Forces Stationed in the Federal Republic of Germany (*hereinafter cited as* Supplementary Agreement), 3 Aug. 1959, 14 U.S.T. 531, T.I.A.S. No. 5351, *as amended* 24 U.S.T. 2355, T.I.A.S. No. 7759, and ―― U.S.T. ――, T.I.A.S. No. 10367.

5. NATO/SOFA at Art. I, ¶ 1(a).

6. *Id.* at Art. I, ¶ 1(b).

7. *Id.* at Art. IX, ¶ 4. It should be noted that the category of local nationals may include United States citizens ordinarily resident in the FRG.

8. *Id.* at Arts. III, X, XI.

9. *Id.* at Art. IX, ¶ 4.

10. For a detailed description of the events leading to the negotiations, the negotiations themselves and the subsequent agreement, see Affidavit of Frank Cipolla, *reprinted in* JA at 348–367.

ment. USAREUR, on the other side, insisted that it had the right to hire U.S. citizens, whether in the U.S. or in the FRG, according to U.S. law and to designate anyone so hired as a member of the civilian component.

The negotiations on this issue reached an impasse. The FRG, however, proved willing to drop its insistence that dependents were subject to German law in exchange for assurances that the job security of local nationals would not be jeopardized by the Dependent Hire Program. USAREUR, in turn, was willing to clarify what it considered its obligation under NATO/SOFA and the Supplementary Agreement to provide the full protection of German law, including the Kuendigungsschutzgesetz, or Protection Against Dismissal Act,[11] to local nationals. Accordingly, a revised Regulation 690–84 was published in the summer of 1974.

Regulation 690–84 applies whenever a reduction in force occurs in positions traditionally classified for local nationals but currently occupied by both local nationals and United States citizens or dependents. The Regulation merely makes clear that the German job security rights and retention priorities, along with other aspects of German law, do not apply to U.S. citizens or dependents. Thus, during a reduction in force the jobs of U.S. citizens and dependents at a particular competitive level are eliminated before those of local nationals to whom the Protection Against Dismissal Act applies.

More specifically, Regulation 690–84 calls first for elimination of jobs occupied by persons ready to retire or temporarily employed. Next, local nationals not covered by the Protection Against Dismissal Act because of age or short tenure are terminated, followed by U.S. employees not ordinarily resident in the FRG. Finally, if additional jobs must be eliminated, local nationals compete based on a system of retention credits tied to family status, age, physical handicaps and length of service.[12]

Appellants were employed by the Army and Air Force Exchange Service (AAFES) during a 1975 reduction in force. Each appellant occupied a position designated as a local national job position. As a result of the reduction in force and the operation of Regulation 690–84, two of the appellants were downgraded and the third was terminated.[13]

The essence of appellants' complaint is that the retention priorities of Regulation 690–84, by which they were adversely affected, violate the prohibition against discrimination contained in Section 106. As noted, Section 106 forbids employment discrimination against American citizens or dependents of members of the United States Armed Forces at any facility or installation operated by the Department of Defense in a foreign country unless such discrimination is permitted by treaty.[14]

Both parties agreed that there were no genuine issues of material fact. The case turns wholly on the interplay between Section 106 and Regulation 690–84. On cross motions for summary judgment the district court determined that the Regulation "only seeks to clarify" the obligations of the Unit-

11. English translation *reprinted in* JA at 403–412. The Protection Against Dismissal Act is applicable to German employees generally. It provides that the dismissal of an employee who qualifies for statutory protection "shall be socially unwarranted [and therefore invalid] if it is not based on reasons connected with the person or conduct of the employee or on urgent operating requirements precluding his continued employment in the establishment." *Id.* at 403.

12. USAREUR Reg. 690–84, § III, *reprinted in* JA at 146, 152–163.

13. Affidavit of Gerald Ralston at ¶¶ 3, 4, *reprinted in* JA at 452, 452; Affidavit of Franziska Scherer at ¶ 4, *reprinted in* JA at 454, 454–55.

14. The precise language of Section 106 is confusing since it employs a double negative, forbidding discrimination "[u]nless prohibited by treaty." The Supreme Court, however, has held that Section 106 is properly read to prohibit such discrimination unless the discrimination is *permitted* by treaty. *Weinberger v. Rossi,* 456 U.S. 25, 29, 102 S.Ct. 1510, 1514, 71 L.Ed.2d 715 (1982).

ed States in the employment of local nationals under NATO/SOFA.[15] Thus, it is not the type of *ad hoc* Department of Defense action with which Congress was concerned in passing Section 106. In other words, although Regulation 690–84 is not itself a "treaty" within the meaning of the exception to Section 106,[16] it falls within the umbrella protection of NATO/SOFA because it seeks merely to implement that treaty.

## II. ANALYSIS

■ In *Weinberger v. Rossi*,[17] the Supreme Court addressed the scope of the "treaty" exception to Section 106. The question at issue was whether "treaty" includes only Article II treaties or whether it also includes international agreements not ratified by the Senate. The Court opted for the broader interpretation, upholding an executive agreement providing for preferential employment of Filipino citizens at United States military bases in the Philippines.

> [T]he brief Congressional debates on this provision indicate that Congress was not concerned with limiting the authority of the President to enter into executive agreements with the host country, but with the ad hoc decisionmaking of military commanders overseas.[18]

The factor precipitating passage of Section 106 was a memorandum issued in early 1971 by Brigadier General Phipps, Commanding General of the European Exchange System. The memorandum encouraged the recruitment and hiring of local nationals instead of United States citizens at the System's stores in order to lower wage costs and turnover rates.[19] Congress reacted bitterly to what it considered an insensitivity to the economic hardships American servicemen endured in Europe, particularly Germany.[20] The Supreme Court concluded, however, that Congress did not intend to repudiate any existing executive agreements or to block the power of the President to enter into agreements granting preferential hiring of local nationals in exchange for base rights or some other *quid pro quo*.[21]

Regulation 690–84 does not appear to be the kind of "ad hoc decisionmaking of military commanders overseas"[22] with which Congress was concerned. The regulation was promulgated only after lengthy and delicate negotiations between the two countries, and it represents a compromise between their conflicting claims. USAREUR did not act unilaterally, but only after consultations with U.S. diplomatic personnel in the FRG and State Department officials in Washington.[23] Nonetheless, Regulation 690–84 can by no stretch be considered a "treaty" within the meaning of Section 106. At a minimum, "treaty" refers to an international agreement concluded between sovereigns.[24] Regulation 690–84 may have been promulgated pursuant to an agreement concluded between sovereigns. By itself, however, it is obviously not an agreement, but only an internal regulation governing USAREUR procedures. It is unilateral not bilateral.

---

15. Memorandum Opinion, No. 79–2598, at 7 (D.D.C. 22 June 1982), *reprinted in* JA at 506, 512.

16. Parts of the district court's opinion might be read to imply that Regulation 690–84 itself qualifies as a "treaty" for purposes of Section 106. *See, e.g.,* Mem.Op. at 5, 7, *reprinted in* JA at 510, 512. That position is untenable. *See* this page *infra*.

17. 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982).

18. 456 U.S. at 33, 102 S.Ct. at 1516.

19. *See* 117 Cong.Rec. 14395–96 (1971) (remarks of Sen. Schweiker), *reprinted in* JA at 312–13.

20. *See id.; id.* at 16126 (remarks of Sen. Cook); *id.* (remarks of Sen. Hughes).

21. 456 U.S. at 31–32, 102 S.Ct. at 1515–1516.

22. *Id.* at 33, 102 S.Ct. at 1516.

23. Affidavit of Raymond C. Ewing at ¶ 8, *reprinted in* JA at 396, 399.

24. 456 U.S. at 29, 102 S.Ct. at 1514. *See* Vienna Convention on the Law of Treaties, 23 May 1969, Art. 2, ¶ 1(a), *reprinted in* 63 Am.J.Int'l L. 875, 876 (1969).

Nor can it be said that Regulation 690–84 is but a mechanical application of what is already implicit in NATO/SOFA and the Supplementary Agreement. These treaties [25] merely provide that German law will apply to local national employees.

The conditions of employment and work, in particular wages, supplementary payments and *conditions for the protection of workers,* shall be those laid down by the legislation of the receiving State.[26]

Thus, the Protection Against Dismissal Act must apply to all local national employees. But it does not follow that similar protections cannot be given to their American counterparts. In other words, by treaty the United States must give a certain absolute level of job protection to local nationals. But the treaties do not prevent the United States from granting equal or better protection to United States dependents employed in the same positions. They do not mandate the sort of explicit retention priorities contained in Regulation 690–84.

■ Nonetheless, Regulation 690–84 is properly regarded as implementing and clarifying the broad and inevitably vague provisions of NATO/SOFA and the Supplementary Agreement. No treaty can determine all its own applications. Interpretation, clarification and implementation are always necessary, and it is the executive branch, in agreement with the other party to the treaty, which bears primary responsi-

bility for these functions. Courts should defer to such executive actions provided they are not inconsistent with or outside the scope of the treaty.[27]

NATO/SOFA and the Supplementary Agreement at least leave open the possibility that German law will provide more favorable conditions of employment than U.S. law. They also state that differences between parties as to the proper interpretation or application of the agreement are to be settled by negotiation.[28] We must assume that Section 106 was not intended to preempt this process or to repudiate any international obligations that stem from it. Regulation 690–84 is properly regarded as fulfilling just such an obligation and it therefore comes within the treaty exception to Section 106—not as a treaty in its own right, but as implementing and clarifying NATO/SOFA and the Supplementary Agreement.[29] Regulation 690–84 is essentially exegetical. It was arrived at through bilateral negotiations and accommodation as envisaged in NATO/SOFA and the Supplementary Agreement, and it reflects the current understanding of the two parties as to the requirements of those treaties.

Furthermore, it is not clear that Regulation 690–84 would violate the prohibition of Section 106 even if it did not fit within the treaty exception. The benefits and burdens of being a U.S. citizen or dependent rather than a local national employee constitute a

---

25. No one disputes that NATO/SOFA, as an Article II treaty, and the Supplementary Agreement, as an executive agreement, are both treaties within the meaning of Section 106.

26. NATO/SOFA at Art. IX, ¶ 4. *See also* Supplementary Agreement at Art. 56, ¶ 1(a).

27. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 183, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936); *Factor v. Laubenheimer,* 290 U.S. 276, 294–95, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933).

28. NATO/SOFA at Art. XVI; Supplementary Agreement at Art. 3.

29. USAREUR has apparently made a practice of publishing regulations to implement pertinent FRG labor statutes. Affidavit of Frank Cipolla at ¶ 7(i), *reprinted in* JA at 348, 356–57. This practice is in keeping with the express language of the Supplementary Agreement.

The German authorities and the authorities of a sending State shall take all administrative measures necessary for the implementation of the NATO Status of Forces Agreement and of the present Agreement, and, where necessary, shall conclude administrative or other agreements to that end.

Supplementary Agreement at Art. 3, ¶ 4. *See also Holmes v. Laird,* D.C., 459 F.2d 1211, 1222 (noting that "corrective machinery" of NATO/SOFA and the Supplementary Agreement is diplomatic not judicial), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).

complex package. It makes no sense to isolate one element of that package and label it as discriminatory. U.S. nationals don't enjoy the retention credits and displacement rights of the Protection Against Dismissal Act. But, conversely, they are free of such requirements as that they obtain a German work permit or pay German taxes and social insurance premiums. Overall, the application of U.S. law to U.S. citizens and dependents in the FRG appears to be a substantial benefit, which these delicate international negotiations seem to confirm.

The judgment of the district court is *Affirmed.*