**JAPAN AIR LINES COMPANY, LTD., Lufthansa German Airlines, and Swissair, Swiss Air Transport Company, Ltd., Petitioners,**

v.

**Elizabeth Hanford DOLE, Secretary of Transportation, Respondent.**

**Pan American World Airways, Inc., Trans World Airlines, Inc., Northwest Airlines, Inc., British Airways, Plc., Intervenors.**

No. 84–1502.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1985.

Decided Sept. 19, 1986.

Laurence A. Short, with whom David E. Short and Marc A. Bernstein, Washington, D.C., were on brief, for petitioners.

Barry L. Molar, Dept. of Transp., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Kenneth N. Weinstein, Deputy Asst. General Counsel for Litiga-tion, Dept. of Transp., Catherine G. O'Sulli-van and Margaret G. Halpern, Dept. of Justice, Washington, D.C., were on brief, for respondent.

Michael J. Roberts, entered an appear-ance for intervenor, Pan American World Airways, Inc.

William C. Clarke, and James D. Tussing, New York City, entered an appearance for intervenor, British Airways, Plc.

Edmund E. Harvey, Washington, D.C., entered an appearance for intervenor, Trans World Airlines, Inc.

Ronald D. Eastman and Barry S. Spec-tor, Washington, D.C. entered appearances for intervenor, Northwest Airlines, Inc.

Before ROBINSON and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

Petitioners, several foreign air carriers, challenge a Civil Aeronautics Board ("CAB" or "Board") order[1] governing cer-tain fares and a particular rate implement-ed by competing carriers with the Board's approval. We cannot say that the Board has departed from its statutory mandate in this matter. We therefore affirm the Board's order.

## I. BACKGROUND

On October 27, 1980, petitioners, Japan Air Lines Company, Ltd. ("JAL"), Lufthan-sa German Airlines ("Lufthansa") and Swissair, Swiss Air Transport Company, Ltd. ("Swissair"), joined by two companies not party to this petition for review, filed a complaint against the marketing of "Visit U.S.A." or "VUSA" fares by several do-mestic air carriers. VUSA fares generally permit a passenger visiting the United

---

1. The Civil Aeronautics Board ceased to exist on January 1, 1985. Orders such as the one at issue in this case remain in effect, however, and are administered by the Secretary of Transpor-tation. Suits involving such orders continue, with the Secretary substituted as the respondent party. *See* Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98–443, § 12(e), 98 Stat. 1703, 1711 (1984).

States from a foreign country to travel to various points within this country at a discount. The particular VUSA fares challenged in this litigation are "restricted," which means that they are available only to passengers who travel to and from the United States on the carrier offering the VUSA fare. Other VUSA fares are "unrestricted"; a passenger may choose one carrier for the trip from the foreign country to the United States and another carrier for travel within the United States.

On May 4, 1981, JAL filed an additional complaint against Northwest Airlines, Inc. ("Northwest") challenging Northwest's "Export Inland Contract Rate" ("ExIn rate"). The ExIn rate applied to freight carriage between Chicago-O'Hare and Seattle. The ExIn rate provided a discount for the Chicago-Seattle leg so long as the shipments were ultimately destined for Hong Kong, Japan, South Korea, the Philippines, or Taiwan. Shipment from Seattle to the Far East could be on any United States or foreign air carrier, or by ocean vessel, at any international tariff rate.

Petitioners challenged the VUSA fares and ExIn rate on the theory that they involved foreign air transportation, and thus that the carriers were required to file them in their international tariffs. In addition, the complaints alleged that the fares and rate were contrary to the provisions of the applicable Civil Air Transport Agreements, which guarantee foreign carriers a fair and equal opportunity to compete. Finally, the complaints alleged that the fares and rate were unjustly discriminatory, as that term is used in the Federal Aviation Act of 1958.

The complaints were consolidated. Various domestic air carriers intervened in the proceedings. In September, 1982, an Administrative Law Judge ("ALJ") conducted a hearing on the complaints. The ALJ issued his initial decision on June 3, 1983. The ALJ found that the fares and rate involved foreign air transportation (thus requiring filing in international tariffs). The ALJ also held, however, that the fares and rate did not deny the foreign carriers a fair and equal opportunity to compete and were not unjustly discriminatory. Joint Appendix ("J.A.") at 169–231 (initial decision).

Both foreign and domestic carriers petitioned the CAB to take discretionary review of the initial decision. The Board granted those petitions and, on August 10, 1984, issued its decision. The Board upheld the ALJ's finding that the VUSA fares involved foreign air transportation, but found that the ExIn rate concerned domestic carriage. The Board also affirmed the ALJ's finding that the fares and rate did not deny the foreign carriers a fair and equal opportunity to compete, and the finding that the fares and rate were not unjustly discriminatory. J.A. at 2–49 (CAB decision).

In their petition for review to this court, petitioners did not challenge the Board's finding that the VUSA fares involved foreign air transportation. Br. of Petitioners at 3–4. Petitioners launch an omnibus challenge to the remainder of the Board decision. We treat their objections in the sequence followed in the Board decision.

## II. ANALYSIS

### A. *ExIn Rate as International Rate*

The CAB held that the ExIn rate did not involve foreign air transportation because it was not restricted to combination with any particular carrier on the foreign portion of any shipment. J.A. at 30. The Board reasoned that if such a rate were available on equal terms, it would be economically independent of the international travel to which it is tied for marketing purposes:

A carrier simply will not price such a fare below its cost, because it has no interest in subsidizing the services of other carriers. Without the ability to restrict participation in the international travel to particular carriers, the offering carrier will have no leverage to require that profits from the international travel subsidize its domestic service. And without a carrier restriction, its fares *prima*

*facie* will be competitively evenhanded in international service.

*Id.*

Petitioners object to the application of this test on the ground that it is inconsistent with the "flow of commerce" test for differentiating foreign travel from domestic. Under the "flow of commerce" test, according to petitioners, the distinction must be drawn by considering the "essential character of the movement." This, in turn, is determined largely by reference to the intent of the passenger or shipper, *i.e.*, whether he intended at the outset to engage in a through journey. *See* Br. of Petitioners at 9. The rate at issue in this case, according to petitioners, involves foreign air transportation because the intent of any shipper who uses the rate is to transport from Chicago ultimately to a foreign destination. Petitioners' essential complaint is that the CAB has previously applied the "flow of commerce" test in these circumstances and that the rejection of that test and the adoption of the "carrier-restriction" test is unaccompanied by an adequate explanation.

It is by now a familiar rule that a court owes some deference to an agency's interpretation of its organic statutes. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Despite this requirement of deference, we cannot countenance arbitrariness. Indeed, there exists a presumption against unexplained changes in agency interpretations. *See Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865, 2866, 77 L.Ed.2d 443 (1983). In particular, we have cautioned that "an agency chang-

ing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute." *Airmark Corp. v. FAA*, 758 F.2d 685, 692 (D.C.Cir.1985) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 125 (1971)). We hold that the CAB adoption of the "carrier-restricted" test in this case was not a significant change from prior interpretations. We cannot say, therefore, that the agency has violated its obligation to interpret consistently the statutes under which it operates.

Our analysis of the issue begins with a review of the statute. The Federal Aviation Act of 1958 explicitly distinguishes between "interstate air transportation," "overseas air transportation," and "foreign air transportation." In particular, " 'foreign air transportation' ... mean[s] the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between ... (c) a place in the United States and any place outside thereof[.]" 49 U.S.C. § 1301(24) (1982).

On its face, the statute does not require that "foreign air transportation" be defined by a "flow of commerce" test. Petitioners insist, however, that CAB interpretation of the term has embodied this test. We must reject that argument. It is apparent that the CAB has never stated that the "flow of commerce" test is the *sole* test for determining whether air transportation is foreign. We have carefully reviewed the CAB cases cited by petitioners and find that they do not support such an absolute view.[2]

---

**2.** We may briefly summarize our reading of each of these CAB cases, proceeding in chronological order. In *Canadian Colonial Airways, Inc.—Investigation*, 2 CAB 752 (1941), the Board determined that flights between Montreal, Canada and Nassau, Bahamas with an overnight stop in Jacksonville, Florida retained their for-

eign character despite the stop in the United States. The Board remarked that the stop was "merely an incidental part of the whole trip to the ultimate destination." *Id.* at 754. The Board cited Supreme Court cases which refer to the "flow of commerce" test, *see id.*, but did not state that this was the only applicable test.

In addition, as the Board noted in this case, "the Board has never given unqualified acceptance to an origin-destination test, and its limited consideration of passenger intent in other statutory contexts was to aid in determining whether there was a 'significant break' in the journey. Where another test, such as a carrier's geographic operations, was more relevant to the statutory provision and policies at issue, flow of commerce principles were readily rejected." J.A. at 25.

Recent support for that proposition appears in the Board's *Tariff Flexibility Rulemaking*, 46 Fed.Reg. 46,787 (1981). That rulemaking was conducted as part of the Board's effort to provide an orderly transition into the pro-competitive scheme mandated by Congress in the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978). The Board sought to establish a flexible tariff-filing procedure for domestic passenger fares. Some parties objected, however, that the provision in most bilateral treaties giving foreign governments a right to have advance notice of prices for foreign air transportation requires the filing of binding domestic tariffs. In response, the Board stated that the test for foreign air transportation is not restricted to the ultimate origin and destination of the passenger or shipper. *See* 46

---

In *Resort Airlines Miami Stopover Investigation*, 19 CAB 1 (1954), the Board held that, for tours from United States cities to Caribbean resort areas, a stopover in Miami, Florida of not more than one-third the duration of the tour would mean that the entire trip was foreign. The Board noted that the question was whether the stopover was "the principal or dominant part of the tour." *Id.* at 8. Again, the Board referred to Supreme Court precedent involving the "flow of commerce" test, but did not state that that test was the sole basis for defining foreign air transportation. *See id.* at n. 14.

In *Foreign Off-Route Charter Service Investigation*, 27 CAB 196 (1958), the Board simply adhered to a prior policy of permitting foreign air carriers, which had been granted permits along designated routes, to schedule additional flights from a United States point named in the permit to points beyond, provided that the flights operated via the described United States terminal point. The Board gave as reasons for this policy "comity and administrative simplicity," and did not even refer to the "flow of commerce" test. *Id.* at 200.

In *Eastern Air Lines, Inc., Enforcement Proceeding*, 40 CAB 745 (1964), an airline had given discount fares to travel agents for trips from points in the United States to Miami, Florida, only if the agents' trips extended beyond Miami to some foreign or overseas point. Such discounts were authorized by law only if the trips were considered overseas or foreign travel. The Board decided to terminate its enforcement proceeding in the matter. In so doing, the Board stated that "[a]s a general rule, the destination which was intended by the passenger when he begins the journey and which was known to the carrier and for which he purchased a ticket determines the character of the trip." *Id.* at 747. Despite this general rule, however, the Board chose an alternate procedure for resolving the case, dismissing the proceeding and instituting a proceeding to establish international agreement for limitations on stopovers. *Id.* at 748.

In *Airfreight Forwarders, Revocations*, 65 CAB 1605 (1974), the CAB sought to revoke certain unused domestic operating authorizations. One carrier contended that it was using its domestic authorization because its international carriage also included a domestic leg. The Board rejected this argument, noting, in part, that "whether a shipment is moving in domestic or international air transportation is determined by its ultimate destination...." *Id.* at 1608. This statement, in context, does not establish that destination is the sole test for distinguishing domestic from international air transportation. The Board relied, in *Airfreight Forwarders*, on the decision in *Canadian Colonial Airways, Inc. —Investigation*, 2 CAB 752 (1941), a case which we have already noted does not stand for that general proposition. Indeed, the issue in *Airfreight Forwarders* was really only whether a shipment moving on a waybill between a point in the United States and a point outside would be international regardless of whether a change of planes was made at the gateway. *Airfreight Forwarders*, 65 CAB at 1608. The Board simply decided that question in the affirmative.

Finally, in *Air Tungaru-UTA, Wet-Lease Exemption*, 90 CAB 606 (1981), Air Tungaru, the flag carrier of the Republic of Kiribati, requested a disclaimer of jurisdiction over the Christmas Island to Tahiti portion of a route from Honolulu to Tahiti via Christmas Island. Air Tangaru proposed to provide service from Honolulu to Christmas Island, but to lease its aircraft to Union de Transport Ariens for the Christmas Island-Tahiti operation. Since Christmas Island and Tahiti are not United States possessions, that route alone would not be in foreign air transportation for purposes of the Act. The Board concluded, however, that the two carriers intended to offer joint services over the Christmas Island-Tahiti segment and, thus, that the entire route was in foreign air transportation. *Id.* at 608. The Board, again, did not even mention the "flow of commerce" test in deciding the case.

Fed. Reg. at 46,791–92. The Board explained that, if adopted, such a test "would require the filing of an exact fare for every domestic market because service in any domestic market might be combined with service to a foreign point." *Id.* at 46,791.

■ The *Tariff Flexibility Rulemaking* establishes the proposition that "slavish adherence" to the intent of the passenger is not the rule. *See* Reply Br. of Petitioners at 13. As the Board clearly stated in that proceeding, "we have rejected that test when necessary to preserve a fundamental policy of the Act." 46 Fed.Reg. at 46,792. We find the Board's adoption, in this case, of a "carrier-restricted" test for distinguishing foreign from domestic air transportation not so inconsistent with prior precedent as to require more explanation than that provided by the Board.[3]

### B. *Equal Opportunity to Compete*

The ALJ determined that the VUSA fares and the Ex-In rate were consistent with the provisions of various bilateral agreements with foreign nations that guarantee to the carriers of the signatory parties a "fair and equal opportunity to compete" in providing services.[4] Only JAL and Lufthansa challenged that conclusion. *See* J.A. at 35–36 & n. 51. The Board affirmed the ALJ's findings and conclusions. *See* J.A. at 35. JAL and Lufthansa press their objections in this court.

Again, the substance of petitioners' claim is that the Board has acted inconsistently. The Board has always insisted, according to petitioners, that carriers must be able to match fares and rates offered by their competitors. In this case, however, the Board held:

> A "fair and equal" opportunity does not mean an identical opportunity, nor does it exempt carriers from normal commercial practices and the consequences of open price competition. In essence, what is required is that foreign carriers have the opportunity to offer reasonably competitive alternatives to particular internal point fares. The issue is therefore primarily a factual one, and there is no simple formula for determining a violation of these bilateral provisions.

J.A. at 37. Petitioners insist that the "reasonably competitive alternatives" approach adopted in this case is inconsistent with the requirement of exact fare-matching expressed in prior cases. We find no such inconsistency.

Our review of this question is informed by the acknowledged need to defer to the expertise of the Board—the agency responsible in part for negotiating the very executive agreements whose interpretation is now in dispute. *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379–80, 72 L.Ed.2d 765 (1982); *Collins v. Weinberger,* 707 F.2d 1518, 1522 (D.C.Cir.1983). We

---

**3.** Petitioners also suggest that the "carrier-restricted" test is defective because the record in this case does not support the considerations underlying the test. Br. of Petitioners at 32. We have reviewed the alleged defects in the record and must reject this attack on the foundation of the "carrier-restricted" test.

We mention one brief example of petitioners' objections on this score. Petitioners object to a passage in the Board's decision which rejects the ALJ's initial decision because the ALJ's approach would require the filing of fares and rates in other cases which would not ordinarily require such filing. *See* Br. of Petitioners at 33 (referring to Board decision, J.A. at 21–22). Petitioners suggest that it was improper for the Board to refer to matters extrinsic to the record in this case. *Id.* at 34. We find nothing impermissible in this practice. Petitioners mistake the prohibition against reference to factual mat-

ters outside the record for a more general prohibition that would preclude an agency from considering how a rule adopted in one case might affect other cases. No such general prohibition exists. Indeed, it is the essence of the adjudicatory process to reason from one case to another, including consideration of hypothetical applications of a rule to other circumstances. It is well-settled, moreover, that an agency retains substantial discretion to develop new rules through adjudicatory proceedings. *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 1581, 91 L.Ed. 1995 (1947).

**4.** *See, e.g.,* United States-Federal Republic of Germany Air Transport Services Agreement of 1955, Art. 8, 7 U.S.T. 527, 532, T.I.A.S. No. 3536; United States-Japan Air Transport Services Agreement of 1952, Art. 10, 4 U.S.T. 1948, 1953, T.I.A.S. No. 2854.

note, in addition, that despite the protestations of petitioners in this case, the governments of these foreign carriers' home countries have lodged no objection to the Board's interpretation of these agreements.

Petitioners cite several cases for the proposition that the requirement of a "fair and equal opportunity to compete" means that a foreign carrier must be able to match fares and rates with its domestic competitors under all circumstances. *See, e.g., Air India, Discriminatory Fares,* 92 CAB 753 (1981); *TWA, re German Discriminatory Practices,* 88 CAB 952 (1981). These cases, however, merely establish that a carrier must be permitted to construct a matching fare on an interline basis. Where a carrier can construct a matching fare but must absorb some loss on its portion of the interline arrangement, the Board has held that a fair and equal opportunity to compete still exists. *See, e.g., Continental Air Lines, Emergency Exemption,* 102 CAB 755, 758–59 (1983); *Continental Excursion Fares, Quantas Complaint,* 96 CAB 792, 794–95 (1982). The Board's use of the term "reasonably competitive alternatives" in this case does not constitute the adoption of some new test. Rather, it merely describes application of the traditional rule to interline arrangements.

Petitioners also attack as erroneous the Board's factual conclusion that the foreign carriers can find reasonably competitive alternatives to the domestic carriers'

fares and rate. Br. of Petitioners at 57–60. The substance of their argument is that foreign carriers cannot, under the laws of their home countries, "prorate" to provide matching fares and rates.[5] This court may set aside the Board's finding on this score only if it is "unsupported by substantial evidence[.]" 5 U.S.C. § 706(2)(E) (1982). "Substantial evidence" need not be overwhelming evidence. "A factual finding is supported by substantial evidence if the record contains 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *American Fin. Services Assoc. v. FTC,* 767 F.2d 957, 985 (D.C.Cir.1985) (quoting *American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 522, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981)). On our review of this record, we find the Board's findings adequately supported, not only as to the availability of prorate arrangements,[6] but also as to the general ability of the foreign carriers to compete with the domestic carriers.[7]

## C. *Unjust Discrimination*

The Federal Aviation Act of 1958 forbids "unjust discrimination" against any particular person, port, locality, or description of traffic in air transportation. *See* 49 U.S.C. § 1374(b) (1982). To test whether that prohibition forbids the fares and rate at issue in this case, the CAB applied the standards of PS–93, 14 C.F.R. § 399.36 (1985).[8] The Board found, and petitioners

---

**5.** In particular, petitioners note that the restricted VUSA fares offered by the domestic carriers are $76 to $250 less costly than the unrestricted VUSA fares. Br. of Petitioners at 51. The Board's answer to this problem, in part, was that the foreign carriers could make "prorate" arrangements. Under such agreements, the foreign carrier would pay the domestic carrier the difference between its ordinary fare or rate and the lower fare or rate that the foreign carrier proposed to charge the passenger or shipper for the domestic leg of the trip. *See* J.A. at 41–43.

**6.** The ALJ found, and the Board agreed, for example, that prorate arrangements are a standard practice in the industry. *See* J.A. at 221 (initial decision); *id.* at 43 (Board order). We find this factual conclusion well supported.

**7.** The ALJ concluded, for example, that, through the use of unrestricted VUSA fares, Lufthansa had been able to carry more VUSA passengers in the United States-Germany market than any United States carrier. J.A. at 218 (initial decision). Petitioner's nowhere challenge this fundamental fact.

**8.** PS–93, 14 C.F.R. § 399 (1985) provides, in pertinent part:

(b) Except in unusual circumstances ... the Board will find a rate for domestic air transportation to constitute unreasonable discrimination only if:

(1) There is a reasonable probability that the rate will result in significant long-run economic injury to passengers or shippers;

now concede, that the fares and rate were lawful under those standards. Petitioners insist, however, that the PS–93 standards were intended to apply only to domestic fares and rates. Moreover, they argue, application of these standards to the fares and rate at issue in this case is inconsistent with prior precedent, which would otherwise compel a finding that the fares and rate are unjustly discriminatory. In sum, in their view, the Board's use of the PS–93 standards in this case was arbitrary and capricious. We cannot agree.

We reemphasize that an agency is not forbidden from changing policy when such changes are supported by adequate reasons. *See Airmark Corp.*, 758 F.2d at 692. In addition, we note, an agency enjoys substantial discretion to proceed with such changes either by rule or by adjudication. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 1581, 91 L.Ed. 1995 (1947); *British Caledonian Airways, Ltd. v. CAB*, 584 F.2d 982, 984 (D.C.Cir. 1978). The Board acted in this case in an adjudicative proceeding. Even if the extension of PS–93 to foreign air transportation may be said to establish a novel rule, inconsistent with prior precedent, we may not upset such changes unless we are convinced that the agency has changed course

(2) The rate is in fact discriminatory according to a reasonable cost allocation or other rational basis;

(3) The rate does not provide transportation or other statutorily recognized benefits that justify the discrimination; and

(4) Actual and potential competitive forces cannot reliably be expected to eliminate the undesirable effects of the discrimination within in a reasonable period.

9. The Board addressed this potential application in its statement adopting PS–93:

While it is true that the original impetus for this policy statement was the ADA of 1978 with its implicit emphasis upon domestic aviation, the Board did not intent to preclude a common international pricing application. We invited comments but made no specific proposals on the international pricing aspects of this subject, and therefore received few concrete proposals or arguments on it. Consequently, we will limit this policy statement to domestic and overseas air transportation.

Nevertheless, the passage of the International Air Transportation Competition Act of

without carefully considering the reasons for, and consequences of, such a change. We consider this question in light of petitioners' remaining objections.

First, petitioners argue that the Board's order in this case violates the plain wording of PS–93, which restricts itself to domestic and overseas air transportation. Br. of Petitioners at 64. The Board's PS–93 policy statement was developed in response to the reduction of the Board's domestic rate authority by the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978). Despite this initial impetus, however, the Board recognized, in adopting the policy statement, that it might apply to foreign air transportation as well.[9] Since then, the Board has applied PS–93 to foreign air transportation on a case-by-case basis. *See, e.g., Lufthansa v. Pan Am, Fares Complaint*, 93 CAB 799, 802 (1982); Charter Trips and Special Services; Removal of Limitations on Off-Route and Cargo Charters, 45 Fed.Reg. 53,358 (Aug. 11, 1980). We find these circumstances readily distinguishable from cases in which an agency has adopted a policy statement for use in one area and then expanded its application, without explanation, to another area.[10]

1978, after our initial policy proposal here, has substantially altered the statutory and policy framework within which we consider international pricing and entry issues. In many pertinent respects, the framework is now similar—if not identical—to the domestic area. While there are *ad hoc* circumstantial differences, such as limited entry in some international markets and detailed pricing control by a number of foreign governments, we believe that many of the fundamental policy considerations that lead us to issue this statement are equally applicable to foreign air transportation. Our staff is now considering this issue, and it also has been raised by the commentors in EDR–351B and EDR–383, by which we proposed, among other things, to permit cargo charters on scheduled flights. Thus, we will address this question in more detail shortly.

45 Fed.Reg. 36,062 (May 29, 1980).

10. Petitioners' principal authority for the proposition that an agency may not expand a policy statement beyond the area of its initial focus is *Advanced Micro Devices v. CAB*, 742 F.2d 1520

Second, petitioners argue that the application of the PS–93 criteria to complaints of discrimination in foreign air transportation is improper because it rests on the premise that foreign air transportation has been deregulated to the same extent as domestic air transportation. *See* Br. of Petitioners at 68. Foreign air transportation has not been deregulated, they argue, because Congress has not changed the unjust discrimination prohibition of 49 U.S.C. § 1374(b) (1982). We reject this view. Congress, in the International Air Transportation Competition Act, expressly directed the CAB to regulate with a pro-competitive outlook.[11] While the initial impetus for PS–93 was the Airline Deregulation Act of 1978, the Board could properly extend the application of PS–93 to foreign air transportation in light of the clear congressional directive in the International Air Transportation Competition Act.

(D.C.Cir.1984). We find that precedent inapposite. In *Advanced Micro,* the CAB had initially proposed to allow carriers to increase international cargo rates up to five percent above a standard foreign rate level and to decrease them without limit. The Board not only would not suspend any rate in the zone, but would, without further investigation, conclusively presume the rate to be economically justified. *Id.* at 1524. The final rule, however, limited the use of the zone to suspension decisions. *Id.* at 1526. Despite this express limitation to suspension decisions, the Board, in *Advanced Micro,* approved an agreement to change rates on the basis of the policy alone, without further investigation. *Id.* at 1527. This court disallowed the expansion of the policy statement, noting both that the policy was not created to determine the reasonableness of final rates and that the Board had, in following the policy statement, failed to make certain required findings. *Id.* at 1540.

The *Advanced Micro* situation diverges from that of the instant case in several important respects. First, in *Advanced Micro,* the Board expressly stated that it would not expand the policy statement beyond the suspension decisions it was designed to cover. By contrast, here, the Board noted that many of the fundamental policy considerations underlying PS–93 would also apply to foreign air transportation. 45 Fed.Reg. 36,062 (May 29, 1980). The Board also stated that it intended to consider the application of PS–93 to foreign air transportation in the context of individual cases. *Id.*

Second, in *Advanced Micro,* we expresssed concern that the Board had failed to provide a

Finally, petitioners argue that the Board's use of PS–93 is an unexplained departure from prior precedent. Br. of Petitioners at 69. This departure, they insist, is all the more egregious because Congress, in enacting the Airline Deregulation Act of 1978, expressed its approval of the Board's prior decisions concerning unlawful discrimination. Br. of Petitioners at 69–70. We reject the view that Congress, in the Airline Deregulation Act, froze Board precedent on unlawful discrimination. The sole basis for petitioners' assertion is a brief comment in a committee report on the Airline Deregulation Act: "The committee believes that current Board case law defining unlawfully discriminatory, preferential, and prejudicial carrier prices and practices are [sic] generally satisfactory." S.Rep. No. 631, 95th Cong., 2d Sess. 109 (1978). This statement must be read in the context of the overall

"carefully reasoned and factually supported explanation for any departure from past practice." *Advanced Micro,* 742 F.2d at 1545. In the instant case, the Board provided a full statement of its reasons for applying PS–93 to foreign air transportation. *See* J.A. at 58 (order instituting investigation) (requesting factual information on applicability of PS–93); *id.* at 200–202 (initial decision of ALJ) (explaining applicability of PS–93); *id.* at 45 (CAB opinion and order on discretionary review) (explaining applicability of PS–93).

Finally, in *Advanced Micro,* the Board applied its policy statement wholesale, without making the findings required under the statute. *Advanced Micro,* 742 F.2d at 1540. We find no such wholesale adoption of the policy statement here. Instead, the Board applied the principles of the policy statement as only one source of legal authority. The Board also considered pre-deregulation case law, and explained how the case fit into that framework, as affected by PS–93. *See* J.A. at 45–49.

11. Congress provided, in particular:

In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:

\*   \*   \*   \*   \*   \*

(4) The placement of maximum reliance on competitive market forces and on actual and potential competition....

49 U.S.C. § 1302(a) (1982).

deregulatory scheme implemented by Congress. Congress initially removed the Board's power to set rates after the Board made a finding of unlawful discrimination in domestic or overseas air transportation. The Board was empowered to remove the discrimination only. *See* Airline Deregulation Act of 1978, Pub.L. No. 95–504, § 37, 92 Stat. 1705, 1741–43 (1978). Eventually, Congress eliminated the Board's power over unlawful discrimination in domestic and overseas air transportation altogether. 49 U.S.C. § 1551(a)(2)(B) (1982). Thus, the offhand remark in the committee report appears to mean little more than that Congress viewed Board precedent on unlawful discrimination as tolerable during the initial phase of deregulation. Viewed in context, this remark can hardly be taken to mean that Congress intended this precedent to remain untouched forever.

### CONCLUSION

The thrust of petitioners' claims in this case is that the CAB has acted inconsistently in a number of areas. We emphasize that it remains our province to review agency treatment of similar cases to prevent arbitrary and capricious action. The need for such review follows from a desire for fair play and fidelity to congressional objectives. Our inquiry into agency action, however, must be tempered by the recognition that the circumstances surrounding agency regulation do not remain static. In particular, by altering the statutory framework within which an agency operates, Congress may dramatically shift the direction of an agency's regulation. In such circumstances, an agency may, with appropriate explanation, alter its prior policies without fear of judicial interference. Finding no error in the Board's order in this case, we affirm.

*It is so ordered.*