**GOVERNMENT OF JAMAICA,**
Petitioner,

v.

**UNITED STATES of America, Richard Thornburgh, Attorney General of the United States, Robert Genzman, United States Attorney for the Middle District of Florida, and James A. Tassone, United States Marshal for the Middle District of Florida, Respondents.**

**No. 91–157–CIV–FTM–98D.**

United States District Court,
M.D. Florida,
Fort Myers Division.

July 31, 1991.

R. Thomas Farrar, Holland & Knight, Miami, Fla., for petitioner.

Russell C. Stoddard, U.S. Atty.'s Office, M.D. Fla., Fort Myers, Fla., for respondents.

## ORDER

KOVACHEVICH, District Judge.

On July 22, 1991, an evidentiary hearing was conducted in connection with the Emergency Petition for Writ of Habeas Corpus and Request for Injunctive and Declaratory Relief filed on behalf of the Government of Jamaica and adopted by Richard Morrison in his individual capacity.[1] Pursuant to this Court's Order of July 3, 1991, the parties filed supplemental briefs in advance of the hearing on issues of particular concern to the Court. At the hearing the Government of Jamaica presented evidence on the question of whether the extradition of Richard Morrison from Jamaica to the United States was in violation of Jamaican law.

Based upon the evidence presented, the comprehensive briefs submitted and oral argument of counsel, it is, for the reasons which follow, the finding of the Court that the petition of the Jamaican Government is properly denied. Defendant Morrison's derivative claim for habeas corpus relief must, accordingly, fail also.[2]

The pertinent facts are relatively simple and not in dispute. At oral argument on

---

1. Defendant Morrison has adopted Jamaica's initial pleadings and arguments only as they pertain to habeas corpus relief. By Order dated July 3, 1991, the Court specifically held that the Jamaican Government lacked standing to seek habeas corpus relief on Mr. Morrison's behalf. Mr. Morrison is, therefore, petitioning on his own behalf for a writ of habeas corpus.

2. Ruling was reserved on the United States Government's ore tenus motion for summary judgment made at the close of the Petitioners' cases. That motion is rendered moot and due to be denied in light of the denial of any relief to the Petitioners.

July 27, 1991, the parties agreed that the facts set forth in the Government's Response and Incorporated Memorandum to Emergency Petition for Writ of Habeas Corpus and Request for Injunctive Relief were accurate. The following findings of fact are derived from that pleading unless citation to the contrary is indicated:

1. In August, 1989, Richard Morrison was indicted on criminal drug trafficking charges in the Middle District of Florida, Fort Myers Division. Unrelated charges are also pending against Mr. Morrison in the Southern District of Florida. In addition to drug trafficking charges, the multi-defendant indictment out of the Southern District, Case No. 88–0652–Cr–Gonzalez, also charges Morrison with murder, attempted murder, interstate trafficking with regard to firearms and bribery. (Exhibit 1 to the Emergency Petition for Writ of Habeas Corpus and Request for Injunctive and Declaratory Relief; Transcript of the July 22, 1991, Hearing on Motion for Writ of Habeas Corpus Before the Honorable Elizabeth A. Kovachevich, p. 21 l. 7—p. 22 l. 7.) [3] It is foreseeable that the facts giving rise to the South Florida indictment might ultimately lead to state murder charges against Morrison for which the death penalty is available.

2. On or about October 31, 1989, the United States presented an extradition request for Morrison to the Jamaican Foreign Ministry pursuant to and in accordance with the Extradition Treaty between the United States and the United Kingdom, signed at London, December 22, 1931; entered into force June 24, 1935, 47 Stat. 2122 (hereinafter "the Extradition Treaty").

3. Following an extradition hearing on February 19, 1991, the Jamaican Magistrate determined that Morrison's extradition to the United States was proper and Morrison was committed to prison to await surrender to the United States.

4. Morrison's subsequent application for habeas corpus relief was denied by the Jamaican Full Court on April 19, 1991.

5. Ten days later, on April 29, 1991, Morrison filed in the Supreme Court of Jamaica a notice of his intent to apply to Her Majesty in Council (hereinafter the "Privy Council") for leave to appeal the Full Court's decision. (Government of Jamaica's Exhibit 1). When it was filed, the notice of intent to appeal was mistakenly placed in the file of an individual by the name of Lester Coke.[4] (Tr. p. 13 l. 7—p. 14 l. 24). Although Morrison continues to be represented by counsel in connection with the proceedings in Jamaica, there is no evidence that the next step in the appeal process has ever been taken; specifically that grounds for the appeal have been filed with the Privy Council. (Tr. p. 81 l. 10—p. 15; p. 83 l. 25—p. 84 l. 4).

6. Morrison did not serve a copy of his notice of intent to appeal on the Director of Public Prosecutions of Jamaica ("the DPP"). When the DPP made an inquiry of the Supreme Court concerning whether any notice had been filed on behalf of Mr. Morrison, the Clerk of the Supreme Court checked Mr. Morrison's file and advised the DPP that no notice of intent to appeal to the Privy Council was pending. (Tr. p. 14 l. 25—p. 15 l. 17).

7. The DPP relied upon the advisement of the Supreme Court Registry when it informed the Minister of Justice of Jamaica that there were no appeals pending on behalf of Morrison. (Tr. p. 15 ll. 12–17). Accordingly, a warrant for the surrender of Richard Morrison to the United States was executed by the Minister of Justice of Jamaica on June 5, 1991.

8. Pursuant to the warrant the United States obtained custody of Morrison on or about June 12, 1991, at which time he was transported to the Middle District of Florida to stand trial.

---

**3.** Citations to the transcript shall hereinafter be enumerated "Tr. p. ___, l. ___."

**4.** Lester Coke is a co-defendant in the Southern District of Florida indictment. Extradition of Mr. Coke has not been accomplished since a

notice of intent to appeal was properly filed on Mr. Coke's behalf. Mr. Coke remains in Jamaica pending the conclusion of his appeal to the Privy Council.

9. On or about June 13, 1991, the Jamaican Ministry of Foreign Affairs advised the United States Embassy in Kingston, Jamaica, by diplomatic note dated June 12, 1991, that Morrison had been surrendered prematurely. The diplomatic letter requested the immediate return of Morrison to Jamaican authorities.

10. On June 14, 1991, the Government of Jamaica presented a letter to the Attorney General, United States of America, requesting Morrison's return to Jamaica to allow Morrison to complete his appeal.

11. Morrison appeared before a United States Magistrate/Judge in the Middle District of Florida on or about June 12, 1991. By Order dated June 14, 1991, Morrison was ordered detained pending trial in Case No. 89–57–CR–FTM–13(C).

12. On or about June 22, 1991, the United States Embassy in Kingston, Jamaica delivered a diplomatic note advising the Jamaican Ministry of Foreign Affairs of the decision of the United States Government that it was not able to accede to the request of the Government of Jamaica.

 It is the position of both Morrison, individually, and the Jamaican Government that Morrison was extradited to the United States illegally by virtue of the pendency of his notice of intent to appeal. According to the Government of Jamaica, because Morrison was mistakenly extradited before his appeal to the Privy Council was complete, the extradition was not in accordance with Jamaican law and, therefore, not in accordance with the Extradition Treaty in effect between the United States

and the sovereign nation of Jamaica.[5] Accordingly, the Petitioners pray that the Court direct Morrison's return to the custody of the Jamaican Government.[6]

As a threshold matter it must be decided whether, under the peculiar facts of this case, the Court should defer to the determination of the Executive Branch of the United States Government that Morrison's return to Jamaica is not warranted. Assuming that it is appropriate for the Court to go forward, the question becomes whether there has actually been a violation of Jamaican law. If this hurdle is crossed it remains to be determined whether there has been a concomitant violation of the Extradition Treaty and, if so, whether return of the Defendant to the custody of the offended nation is an appropriate remedy.[7]

### Federalism

The facts underlying this action present a unique case of first impression. No reported case exists in which *the United States proceeded in conformity with a treaty of extradition only to have the surrendering nation lodge a formal protest after custody of the defendant was transferred based upon an irregularity in the extradition process within the surrendering nation.* The Government submits that the Petitioners should be denied relief on grounds of federalism. Given the determination by the Executive Branch not to honor the request through diplomatic channels for Morrison's return, serious consideration must be afforded the question of whether this is an appropriate instance for court intervention.

---

5. Article 8 of the Extradition Treaty specifically provides:

 The extradition of fugitive criminals under the provisions of this Treaty shall be carried out in the United States and the territory of His Britannic Majesty respectively in conformity with the laws regulating extradition for the time being in force in the territory from which the surrender of the fugitive criminal is claimed.

6. As a contracting party to the treaty, Jamaica has standing to assert its claim that the treaty has been violated. *See Matta–Ballesteros v. Henman,* 697 F.Supp. 1040, 1043 (S.D.Ill.1988); *See United State v. Verdugo–Urquidez,* 939 F.2d 1341

(9th Cir.1991). Morrison's standing to seek habeas corpus relief is derivative of Jamaica's rights under the treaty. *See Verdugo–Urquidez,* 939 F.2d at fn. 22 (a government may withdraw a protest after it has been lodged. Once it does so, it is generally accepted in international law that the individual no longer has standing to object to the exercise of jurisdiction over his person."); *See also* This Court's Order of July 3, 1991.

7. Return of custody to the offended nation was recently found to be the appropriate remedy for a violation of the extradition treaty in effect between the United States and Mexico. *Verdugo–Urquidez,* at 1347, 1359.

■ As previously noted in the Order of July 3, 1991, questions of treaty interpretation, clarification and implementation are functions necessarily carried out by the executive branch of government. *Collins v. Weinberger,* 707 F.2d 1518, 1522 (D.C.Cir.1983); *United States v. Martinez,* 755 F.Supp. 1031, 1036 (N.D.Ga.1991) (inquiry behind an extradition is appropriately reserved for the executive branch of government because of its exclusive authority to conduct foreign affairs.) Moreover, where executive action is not inconsistent with or outside the scope of the treaty, the court should defer to such action. *Collins,* 707 F.2d at 1522.

■ While this Court is mindful that treaties are generally subject to interpretation by courts as the supreme law of the land pursuant to Article 6 of United States Constitution, the construction of a treaty by the political department of government, though not conclusive, is "of weight". *Verdugo–Urquidez,* at 1353 (quoting *Factor v. Laubenheimer,* 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 [1933]). Although courts can and do construe the application of treaties to individual cases with some regularity, none of the cases cited by the Petitioners are factually analogous to the instant case. *In this case the Government of the United States was not the cause of the alleged illegality under the Extradition Treaty.*[8] *Compare Verdugo–Urquidez,* at 1346 (citing *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) for the proposition that "a nongovernmental kidnapping does not violate an extradition treaty even if the [United States] government ultimately benefits

thereby . . . ."). By contrast, in *Verdugo–Urquidez,* the contention made is that agents of the DEA hired Mexican police officers to kidnap Verdugo. Not surprisingly, the court there concluded that:

[o]ur review of the underlying purposes of extradition treaties, including the one between the United States and Mexico, leads us to conclude that they are not intended to permit or encourage government authorized or sponsored kidnappings. Thus, we have no occasion to turn to the Executive's views.

*Id., See also United States v. Caro–Quintero,* 745 F.Supp. 599 (C.D.Cal.1990).

In the final analysis, this Court remains of the opinion that this is precisely the sort of instance in which deference should be afforded to the Executive Branch. In addition to the fact that the United States has done nothing wrong, there are in this case a multitude of factors which the political branch is the proper body to analyze and evaluate. If, for example, Morrison is returned to Jamaica his status pending appeal remains unclear. Also unclear is the effect his return would have on the extradition process from the perspective of the United States. More precisely, would Morrison's return to Jamaica moot the United States' request for extradition thus necessitating initiation of extradition proceedings a second time. Either way, there is no guarantee that the appeals process will be concluded within any specified period of time.[9]

■ These are all considerations of political import which are singularly within the province of the Executive Branch. Since this is a case of first impression, however,

---

8. The notion that the United States was a party to the alleged illegality underlying the extradition process because the DPP was acting as an agent of the United States is not well taken. Petitioner's reliance on *United States v. Caro–Quintero,* 745 F.Supp. 599, 609 (C.D.Cal.1990), in this regard is misplaced. That "state responsibility attaches to acts committed by agents of a state or by private individuals acting on behalf of the state" *id.,* does not support the conclusion that the DPP was in fact acting as an agent of the United States. Moreover, if this agency theory were correct, it is conceivable that the United States could find itself in the untenable position of being accountable in civil damages for

torts committed by Mr. Morrison while in the custody of the Jamaican Government during the processing of his extradition.

9. The expert testimony presented to this Court indicates that there is no requirement that the notice of intent to appeal be followed by the filing of grounds for appeal within any time frame other than generally that which is "reasonable". (Tr. p. 67 l. 25—p. 68 l. 16). Jamaica's expert conceded that technically Mr. Morrison could wait thirty or forty years to proceed forward with the next step of his appeal. (Tr. p. 64 ll. 3–14).

it will be assumed for the sake of argument that a judicial determination of the parties' respective rights under the Extradition Treaty is appropriate.

### Jamaican Law

Whether Mr. Morrison's extradition was in violation of Jamaican law is far from settled. The answer turns upon whether the filing of a notice of intent to appeal acts as a stay of the extradition process. Interestingly, the two witnesses presented by the Jamaican Government gave differing testimony on this point.

Mr. Douglas Leys, Assistant Crown Counsel to the Assistant Attorney General, (Tr. p. 11 ll. 15–19), testified that an individual is not restricted from leaving the United Kingdom while continuing to process a habeas corpus appeal. (Tr. p. 25 l. 23—p. 26 l. 9). Mr. Lenox Campbell, also a member of the staff of the Jamaican Attorney General's Office and a former prosecuting attorney, Assistant Director of Public Prosecutions and resident magistrate testified at great length that, in his opinion, the filing of a notice of intent to appeal acts as a stay of the extradition process and further, that once custody of an individual has been surrendered to the requesting nation, the Privy Council will not render a determination on the appeal. (Tr. p. 27 l. 20—p. 30 l. 4; p. 41 l. 22—p. 77 l. 6).

Mr. Campbell conceded that there exists no rule of law, no statutory authority nor any case law to support his position. Rather, the extradition process would, according to Mr. Campbell, be stayed as a matter of constitutional convention for which the authoritative work of Professor D'Smith was cited. S.A. D'Smith, *The Constitutional and Administrative Law*, pp. 47–66 (1971). The witness indicated that constitutional conventions are unwritten customs, usages and practices which are as binding as written law. (Tr. p. 70 ll. 2–23). Thus, despite the fact that Mr. Morrison's extradition before completion of his appeal presents a case of first impression for Jamaican Courts, the witness remained adamant that convention would bar any further processing of the appeal unless and until Morrison is returned to Jamaica.

The cited authority itself commands less certainty. According to D'Smith, constitutional conventions are, as a general proposition, not directly enforceable in courts as compared with rules of strict law, to which obedience is readily enforceable. S.A. D'Smith, *The Constitutional and Administrative Law*, p. 52. D'Smith goes on to advise that codification of conventions is not desirable because of the resulting inflexibility of constitutional interpretation. According to D'Smith, there are contexts where "the rules ought not to be crystal clear." D'Smith at 54.

With this understanding of the role of constitutional conventions in mind, it is impossible to determine with any degree of certainty, whether the Jamaican Courts, here the Privy Council, would construe the filing of a notice of intent to appeal as a stay of extradition proceedings, or more significantly, whether they would decline to render a decision on an appeal prosecuted by an appellant whose surrender to the extraditing nation has already been accomplished. With all due respect to Mr. Campbell, his opinion that the Privy Council would not render a decision when the appellant is no longer in Jamaica is without adequate foundation. Likewise, that the effect of the filing of a notice of intent to appeal is to stay the extradition process under Jamaican law has not been established.

### Conclusion

Because the Court cannot find that Jamaican law was violated in connection with the extradition process, there is no basis for concluding incomplete compliance with the Extradition Treaty. Moreover, the petitioners have been unable to point to any concrete law or binding precedent which suggests that Morrison cannot exercise his right of appeal under the Jamaican Constitution while he is in the custody of the United States. The direct testimony of Mr. Leys was that there is no prohibition to the appeal going forward even though Morrison is not physically present in Jamaica.

If Morrison continues his appeal, only at such time as the Privy Council determines that his position has merit does this case truly become ripe. Should the Privy Council deny Morrison's appeal, the issues before this Court become moot. What has been presented at this stage is merely a request by the Jamaican Government for remedy of their mistake. Full performance under the Extradition Treaty has been rendered by both contracting nations: the writ was effectuated; performance was completed. Under these circumstances the relief requested must come, if at all, through diplomatic channels.

In the clear absence of any wrongdoing on the part of the United States and this Court's finding that there has been no violation of Jamaican law in connection with the extradition process, the petition of the Jamaican Government for injunctive and declaratory relief must be denied. Defendant Morrison's derivative petition for writ of habeas corpus must fail as well.

For the reasons set forth herein it is, upon consideration

ORDERED:

1. That the Government of Jamaica's Emergency Petition for Writ of Habeas Corpus and Request for Injunctive and Declaratory Relief be, and the same is hereby DENIED.

2. That Richard Morrison's Petition for Writ of Habeas Corpus be, and the same is hereby DISMISSED for lack of standing.

3. That the United States Government's ore tenus motion for summary judgment be, and the same is hereby DENIED as being moot.

DONE AND ORDERED.