**UNITED STATES of America, Plaintiff,**

v.

**Rafael CARO–QUINTERO, et al., Defendants.**

**No. CR 87–422(F)–ER.**

United States District Court, C.D. California.

Aug. 10, 1990.

As Corrected Aug. 14, 1990.

U.S. Atty., Manuel A. Medrano, John L. Carlton, Asst. U.S. Attys., Los Angeles, Cal., for U.S.

Martin R. Stolar, New York City, for Juan Ramon Matta–Ballesteros.

Edward Medvine, James E. Blancarte, Ronald A. DiNicola, Brian M. Colligan,

Mary E. Fulginiti, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for Ruben Zuno–Arce.

Gregory Nicolaysen, Federal Litigators Group, Inc., Beverly Hills, Cal., for Javier Vasquez–Velasco.

Mary E. Kelly, Los Angeles, Cal., Michael S. Meza, Fountain Valley, Cal., for Juan Jose Bernabe–Ramirez.

Robert Steinberg, Beverly Hills, Cal., for Humberto Alvarez–Machain.

## ORDER AND OPINION

RAFEEDIE, District Judge.

Before the Court is a motion filed by defendant Humberto Alvarez–Machain to dismiss for outrageous government conduct and for lack of personal jurisdiction. Defendant argues that he is entitled to such relief because the means by which the United States secured his presence before this Court runs afoul of due process clause of the fifth amendment and international law, and undermines the integrity of the judicial system. For the reasons stated below defendant's motion to dismiss for outrageous government conduct is denied. However, the Court finds that the United States violated the extradition treaty between the United States and Mexico when it unilaterally abducted defendant from his homeland. Under these circumstances, the Court lacks jurisdiction to try this defendant. Accordingly, the defendant is ordered discharged and the government is ordered to repatriate the defendant to Mexico forthwith.

## INTRODUCTION

Doctor Humberto Alvarez–Machain is a Mexican national charged in connection with the torture/murder of Drug Enforcement Administration Special Agent Enrique Camarena–Salazar.[1] On May 10, 1990, Dr. Machain filed a motion to dismiss for outrageous government conduct and for lack of personal jurisdiction. Dr. Machain argues that the manner in which his physical presence within the jurisdiction of this Court was secured warrants dismissal. The Court has distilled four theories asserted as a basis for relief from the briefs filed by counsel for defendant.[2] First, Dr. Machain asserts that he has been deprived of due process of law guaranteed by the fifth amendment to the United States Constitution. A second ground is that dismissal is warranted because his presence in this country was obtained by means which violate the extradition treaty between the United States and Mexico. Third, Dr. Machain asserts that dismissal is warranted because his presence in this country was obtained by means which violate the terms of the Charters of the United Nations and the Organization of American States. Finally, the Court is urged to dismiss the indictment in an exercise of the Court's supervisory power.[3]

## BACKGROUND

On May 25, 1990, the Court conducted an evidentiary hearing on this matter. A number of witnesses testified including Dr. Machain, DEA Special Agent Hector Berrellez, chief of "Operation Leyenda" (the DEA investigation of the Camarena murder), and DEA informant Antonio Garate–Bustamante, an admitted former advisor to Mexican drug lord Ernesto Fonseca–Carrillo. From this testimony the Court finds the following facts.

On February 7, 1985, DEA agent Enrique Camarena was kidnapped outside the

---

**1.** The sixth superceding indictment, returned on January 31, 1990, charges Machain with conspiracy to commit violent acts and violent acts in furtherance of an enterprise engaged in racketeering activity (18 U.S.C. § 1959), conspiracy to kidnap a federal agent (18 U.S.C. § 1201(c)), kidnap of a federal agent (18 U.S.C. § 1201(a)(5)), felony-murder (18 U.S.C. § 1111(a), 1114), and accessory after the fact (18 U.S.C. § 3).

**2.** These briefs have provided the Court with little assistance toward resolving the issues raised by defendant's motion.

**3.** In his moving papers, defendant also argued that the indictment should be dismissed because the statutes charged do not have extraterritorial application. The Court denied this aspect of defendant's motion at the May 25, 1990, hearing of this motion.

American consulate in Guadalajara, Jalisco, Mexico. One month later, agent Camarena's mutilated body was found about sixty miles outside of Guadalajara along with the body of Alfredo Zavala–Avelar, a Mexican pilot who had assisted Camarena in locating marijuana plantations.

On January 30, 1985, a sixth superseding indictment was returned in this case. This indictment charges twenty-two persons, including Dr. Machain, with crimes in connection with the Camarena and Zavala torture/murders.[4] To date, seven of the twenty-two indicted persons have been brought before this Court to stand trial on these offenses. Of the seven, three have been brought before this Court by means of covert forcible abduction from their homelands. Dr. Machain, a doctor of medicine with a specialty in obstetrics and gynecology who practices in Guadalajara, is the third such defendant.[5]

Prior to the successful abduction of Dr. Machain, the DEA attempted to secure his presence in this jurisdiction through informal negotiations with representatives of the Mexican government.

## A. Negotiations with MFJP Commandante Carrillo del Rey

In December, 1989, DEA informant Garate was contacted by Mexican Federal Judicial Police (MFJP) commandante Jorge Castillo del Rey. Castillo sought a meeting with the DEA to discuss the possible exchange of a Mexican national suspected of involvement in the Camarena killing for Isaac Naredo Moreno, who was residing in the United States and wanted by the Attorney General of Mexico in connection with the theft of large sums of money from politicians in Mexico. On December 13, 1989, DEA agent Berrellez and DEA Special Agent Bill Waters met with Castillo and an unidentified MFJP commandante in Los Angeles. Castillo advised the agents

that he was working under Javier Orosco–Orosco, the chief of the MFJP fugitive detail in Mexico City. Castillo further advised the agents that he was present at the meeting with the full knowledge and authority of the Attorney General of Mexico. At the meeting, an agreement was struck whereby Dr. Machain would be delivered to the United States, and, upon receipt of Dr. Machain, the United States would determine the immigration status of Moreno and would begin deportation proceedings against Moreno if it were initially determined that he was deportable. The Mexican officials suggested that this arrangement be carried out "under the table" because its revelation would "upset" Mexican citizens. They emphasized that their identities should not be revealed. Castillo indicated that the delivery would be made after the Christmas holiday.

On January 7, 1990, Garate advised Berrellez that the Mexican officials required $50,000 in advance to cover the expense of transporting Dr. Machain to the United States. The agents indicated that the DEA would not front any money for the operation. This was the apparent undoing of the agreement. For several days in January, DEA agents in El Paso waited in vain for the arrival of Dr. Machain. Dr. Machain was not delivered, and the agents returned to Los Angeles.

## B. Castillo del Rey's Request for a Second Meeting

On January 25, 1990, Castillo again contacted Garate and requested a second meeting with DEA officials regarding the possible exchange of Dr. Machain for Moreno. He indicated that he would be joined by Pablo Aleman–Diaz, the second highest ranking commandante in the MFJP. Though agent Berrellez initially agreed to the meeting, he later declined in light of the tension between the Mexican govern-

---

**4.** Some of the persons named in the sixth superseding indictment are charged with the murders of tourists John Walker and Alberto Radelat.

**5.** *See also, Matta–Ballesteros ex rel. Stolar v. Henman*, 697 F.Supp. 1040 (S.D.Ill.1988), *aff'd,*

896 F.2d 255 (7th Cir.1990) (discussing abduction of defendant Matta–Ballesteros); *United States v. Verdugo–Urquidez,* 856 F.2d 1214 (9th Cir.1988), *rev'd,* —— U.S. ——, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (discussing abduction of defendant Verdugo–Urquidez).

ment and the United States which resulted from the airing of an NBC mini-series based upon the Camarena murder and ensuing investigation.[6] Berrellez testified that he cancelled the meeting because he feared that the meeting was a "set-up" by the Mexicans. No further meetings occurred between the DEA and representatives of the Mexican government.

### C. The Abduction

Prior to, during, and after these communications with representatives of the Mexican government, agent Berrellez instructed Garate to convey to Garate's contacts in Mexico that the DEA would pay for information leading to the arrest and capture of individuals responsible for the death of Special Agent Camarena. In March of 1990, Garate told Berrellez that his "associates" in Mexico believed that they could successfully apprehend Dr. Machain and deliver him to custody in the United States. According to Garate, his "associates" include former military police officers, various civilians, and at least two current police officers.

Special Agent Berrellez instructed Garate to tell his associates that the DEA would pay them a $50,000 reward plus expenses if Dr. Machain were delivered to the DEA in the United States. Berrellez testified that he received authorization to make this offer not only from his superiors in the Los Angeles division of the DEA, but also from officials in Washington, D.C., including Pete Gruden, Deputy Director of the DEA. Garate declared that he communicated this offer to his associates. During March, Berrellez had several discussions with Garate regarding the progress of Garate's associates in Mexico.[7] Berrellez testified that the abduction and the final terms of the abduction had been approved by the DEA in Washington, D.C., and agent Berrellez believed that the United

States Attorney General's Office had also been consulted.

On April 2, 1990, at about 7:45 p.m., Dr. Machain was in his office in Guadalajara, having just finished treating a patient. Five or six armed men burst into his office. One showed Dr. Machain a badge which appeared to be the badge of the federal police. Another man placed a gun to Dr. Machain's head and told him to cooperate or he would be shot.

Dr. Machain was taken to a house in Guadalajara. One of the men hit him in the stomach as he exited the car at their request. In the house, he was forced to lay on the floor face down for two to three hours. Dr. Machain testified that he was shocked six or seven times through the soles of his shoes with a "an electric shock apparatus." He says that he was injected twice with a substance that made him feel "light-headed and dizzy."

Dr. Machain was then transported by car to Leon where they were joined by a "fair-skinned" man. They all boarded a twin engine airplane. Dr. Machain asked the fair-skinned man to identify himself and to indicate where they were going. The man said that he was "with the DEA" and they were going to El Paso. Agent Berrellez testified that no DEA agents participated in the actual kidnapping.

When they arrived in El Paso on April 3, agent Berrellez, Mr. Garate, and others were waiting for them on the runway. Only Dr. Machain exited the plane. As he exited, one of the men in the plane reportedly said, "We are Mexican police, here is your fugitive."[8]

As of May 25, the DEA had made a partial reward payment of $20,000 to the Mexican abductors. In addition, the DEA evacuated seven of the abductors and their families from Mexico to the United States.

---

**6.** "Drug Wars: The Camarena Story" aired on NBC on January 7, 8 and 9, 1990.

**7.** Garate testified that he did not make a move without first consulting with and obtaining authorization from agent Berrellez. He testified that "I could not take any step or make any promise without checking with Mr. Berrellez on

the conditions of them and under which Mr. Berrellez wanted this operation to be carried out, if he wanted it to be carried out."

**8.** Agent Berrellez testified that he did not know whether the abductors were acting under the authority of their government.

Finally, the DEA continues to pay expenses for these persons in an amount of approximately $6,000 per week. Garate testified that those abductors who were not evacuated to the United States were arrested, and in some cases beaten, by the MFJP.

Upon his arrival in El Paso on April 3, Dr. Machain was asked whether he had been tortured, mistreated or abused. Dr. Machain answered that he had not, though he complained that he had injured his finger on the door of the aircraft.

Shortly after his arrival, Dr. Machain complain of a pain radiating from his chest and pressure in his chest. He received prompt medical treatment from Dr. Mesa, a Spanish-speaking physician at Thomason General Hospital in El Paso. Dr. Mesa testified that he examined Dr. Machain from head to foot and found no sign of mistreatment or abuse. Dr. Machain did not mention any mistreatment or abuse. Dr. Meza prescribed a pain killer. Dr. Machain was subsequently treated by various other medical personnel during his incarceration. At no time did he indicate to the treating personnel that he had been mistreated by his kidnappers.

Dr. Machain testified that he was trained in treating trauma victims. He testified his current medical practice includes the treatment of injured and traumatized patients. He testified that when he treats a patient suffering from a traumatic injury, he seeks all the relevant information that is available to the patient.

On April 18, 1990, the Embassy of Mexico presented a diplomatic note to the United States Department of State in Washington, D.C., requesting a detailed report on possible U.S. participation in the abduction of Dr. Machain.[9] The Mexican government indicated that it was making "a scrupulous investigation [of] this case." The Mexican government advised the Department of State that "if it is proven that these actions were performed with the illegal participation of the U.S. authorities, the binational cooperation in the fight against drug trafficking will be endangered...."

On May 16, 1990, the Embassy of Mexico presented a second diplomatic note to the Department of State. The note stated that "[t]he Government of Mexico considers that the kidnapping of Dr. Alvarez Machain and his transfer from Mexican territory to the United States of America were carried out with the knowledge of persons working for the U.S. government, in violation of the procedure established in the extradition treaty in force between the two countries." In the note, the government of Mexico demanded Machain's return to Mexico.

On July 19, 1990, the Embassy of Mexico presented a third diplomatic note to the Department of State requesting the provisional arrest and extradition of Garate and Special Agent Berrellez for prosecution in Mexico for crimes relating to the abduction of Dr. Machain.

## DISCUSSION

### I. Dr. Machain's Due Process Claim

Dr. Machain argues that this Court lacks jurisdiction over him because his abduction denies him due process of law as guaranteed by the fifth amendment.

In *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), the Supreme Court established the long standing rule of law that a forcible abduction does not offend due process and does not require that a court dismiss an indictment for the loss of jurisdiction on those grounds. The Supreme Court reaffirmed this rule in *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). These cases form the basis of the *Ker–Frisbie* doctrine.

In *Ker,* the defendant challenged his conviction alleging that he had been kidnapped in Peru and brought into Illinois to stand trial against his will. The Court held that forcible abduction is not a ground to challenge jurisdiction over the person. *Id.* at

9. On May 30, 1990, the Court ordered the government to submit to the Court "any documents indicating that the government of Mexico has filed an official protest regarding the abduction of defendant Machain with the United States government" as well as translated transcriptions of any such documents. The diplomatic notes referred to in this opinion were submitted to the Court by the government pursuant to this Order.

444, 7 S.Ct. at 229. In *Frisbie,* defendant sought a writ of habeas corpus challenging his detention in Illinois. He alleged that while he was living in Michigan, he was forcibly seized by Michigan officers, handcuffed and blackjacked (flogged) and taken to Michigan. The Court rejected the defendant's contention that he should be released due to the manner in which Illinois secured his presence in that jurisdiction.

> The Court has never departed from the rule announced in *Ker,* that the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of forcible abduction.... There is nothing in the Constitution that requires a court to permit a guilty person to escape justice because he was brought to trial against his will.

*Frisbie,* 342 U.S. at 522, 72 S.Ct. at 511–12. Subsequent opinions of the Court hold fast to this doctrine. *See e.g., Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) (illegal arrest or detention does not void a subsequent conviction); *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980) ("Respondent is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the government of the opportunity to prove his guilt through introduction of evidence wholly untainted by the police misconduct."); *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1039–40, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) ("the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest").

Despite these clear, and, in some cases, recent pronouncements from the Supreme Court, the Second and Ninth Circuits have recognized an exception to the *Ker–Frisbie* Doctrine. The Second Circuit requires a court to divest itself of jurisdiction over the defendant where the defendant establishes governmental conduct "of the most shocking and outrageous kind." *United States ex rel Lugan v. Gengler,* 510 F.2d 62, 65–66 (2d Cir.) *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). As framed by the Ninth Circuit, a defendant must make "a strong showing of grossly cruel and unusual barbarities inflicted upon him by persons who can be characterized as paid agents of the United States" to fit within the exception to the *Ker–Frisbie* doctrine. *United States v. Lovato,* 520 F.2d 1270, 1271 (9th Cir.) (per curiam), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975); *see also, United States v. Valot,* 625 F.2d 308 (9th Cir.1980) (dismissal of an indictment is warranted only where a defendant demonstrates governmental misconduct "of the most shocking and outrageous kind" (quoting *Gengler,* 510 F.2d at 65–66)).[10]

■■■ While the Court finds that Dr. Machain's abductors were paid agents of the United States, Dr. Machain's allegations of mistreatment, even if taken as true, do not constitute acts of such barbarism as to warrant dismissal of the indictment under the case law. Moreover, Dr. Machain's allegations of mistreatment are not worthy of belief. Dr. Machain, a medical doctor trained in trauma care, testified that shortly after his arrival in the United States he developed chest pains. Yet when he sought relief from various examining medical personnel, he failed to relate to them that he had been repeatedly shocked with an electrical apparatus the day before these pains developed. Surely Dr. Machain

---

**10.** This Court is not aware of any case in which an indictment has been dismissed under an exception to the *Ker–Frisbie* doctrine. *See also, Matta–Ballesteros v. Henman,* 896 F.2d 255, 261 (7th Cir.1990) (unaware of any such case). Obviously the conduct must be more barbaric than that alleged in *Frisbie* (blackjacking). The Ninth Circuit has indicated that the conduct alleged in the Second Circuit case of *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), is "shocking to the conscience." *United States v. Fielding,* 645 F.2d 719, 723 (9th Cir.1981). In *Toscanino,* the defendant alleged that he had been kidnapped in Peru, and brutally tortured and interrogated for 17 days and held incommunicado for a period and interrogated for 17 days and held inco of time and denied food and water, all with the knowledge of the Assistant United States Attorney. 500 F.2d at 275. The Second Circuit has suggested that the Toscanino showing is the minimum required showing to invoke the doctrine. *See, United States v. Reed,* 639 F.2d 896, 902 (2d Cir.1981).

would have relayed this information to his treating physicians had he actually been repeatedly shocked. Under these circumstances, Dr. Machain's recent allegations of abuse are simply not credible.

Defendant has failed to demonstrate that his case fits within the narrow exception to the *Ker–Frisbie* doctrine. Accordingly, defendant's motion to dismiss on due process grounds is denied.

## II. The Extradition Treaty

Dr. Machain contends that this Court lacks jurisdiction because his abduction violates the Extradition Treaty Between the United States and the United Mexican States which took force on January 25, 1980. 31 U.S.T. 5059, T.I.A.S. No. 9656.

### A. *Ker* Doctrine Inapplicable

As discussed earlier, the *Ker–Frisbie* doctrine is a constitutional doctrine which limits application of the due process clause of the fifth amendment for the purpose of dismissing an indictment. The doctrine has no application to violations of federal treaty law. This is illustrated by the Court's holding in *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), decided the same day as *Ker*. In *Rauscher* the Court held that an extradited person physically present within a court's jurisdiction

> can only be tried for one of the offenses described in that treaty, and [only] for the offense with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings.

*Id.* at 430, 7 S.Ct. at 246 (defining the "doctrine of specialty"). Similarly, in *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927), involving a challenge to the lower court's jurisdiction based upon a treaty between the United States and Britain, the Court found that the *Ker* doctrine had no application, holding that where "a treaty of the United States is directly involved ... the question is quite

different." *Id.* at 606, 47 S.Ct. at 535. *See also, Cook v. United States*, 288 U.S. 102, 121, 53 S.Ct. 305, 312, 77 L.Ed. 641 (1933) (*Ker* doctrine inapplicable where basis for relief is treaty violation); *United States v. Toscanino*, 500 F.2d 267, 278 (2d Cir.1974) ("*Ker* does not apply where a defendant has been brought into the district court's jurisdiction by forcible abduction in violation of a treaty"); *United States v. Ferris*, 19 F.2d 925, 926 (N.D.Cal.1927) ("The prosecution contends ... that courts will try those before it, regardless of the methods employed to bring them here. There are many cases generally so holding, but none of authority wherein a treaty or other federal law was violated, as in the case at bar. That presents a very different aspect and case. 'A decent respect for the opinions of mankind,' national honor, harmonious relations between nations, and avoidance of war, require that the contracts and law represented by treaties shall be scrupulously observed, held inviolate, and in good faith precisely performed [and] require that treaties shall not be reduced to mere 'scraps of paper.' ").

### B. Invoking an Extradition Treaty in U.S. Courts

#### 1. self-executing vs. executory treaties

■ Treaties are the "Supreme Law of the Land." U.S. Const. art. VI, cl. 2. However, the American legal system recognizes a distinction between "self-executing" treaties and "executory" treaties. A self-executing treaty is federal law which must be enforced in federal court unless superseded by other federal law. A self-executing treaty is enforceable without resort to implementing legislation by Congress. On the other hand, an executory treaty is not enforceable until Congress has enacted implementing legislation. Absent such legislation, an infraction of an executory treaty "becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress...." *Head Money Cases*, 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884). An executory treaty is not enforceable in American courts. *See generally*, Restatement (Third) of the Foreign Relations Law

of the United States § 111 (1987) ("Restatement").

▮ Extradition treaties by their nature are deemed self-executing and thus are enforceable without the aid of implementing legislation. 1 M. Bassiouni, International Extradition: United States Law & Practice, Ch. 2, § 4.1, pp. 71–72, § 4.2, p. 74 (2d ed. 1987) ("Bassiouni").[11]

### 2. Standing

Whether a treaty is self-executing is a question distinct from whether a party has standing to enforce its terms. Restatement § 111, comments g, h. Thus a second question arises. Who may raise a violation of the treaty—the extradited person, the offended sovereign, or both?

#### a. standing to raise forcible abduction as a violation of an extradition treaty

"Ordinarily, claims for violation of an international obligation may be made only by the state to whom the obligation is owed." Restatement § 902, comment a; *see also*, Restatement § 906, comment a. Many courts have held that only the sovereign may object to the method of securing a person's presence as violative of the procedures of an extradition treaty. For example, in *United States v. Reed*, 639 F.2d 896 (2d Cir.1981), the defendant complained that he was unilaterally abducted by the CIA from the island of Bimini in the Bahamas and forcibly brought to Fort Lauderdale, Florida. *Id.* at 901. The defendant claimed that his abduction violated the extradition treaty in effect between the United States and the Bahamas. The Second Circuit found that Reed had no standing to raise this argument. "[A]bsent protest or objection by the offended sovereign, Reed has no standing to raise violation of international law as an issue." *Id.* at 902. *See also, United States v. Valot*, 625 F.2d 308, 310 (9th Cir.1980) (in response to allegation that abduction violated extradition treaty the court held that "[e]ven where a treaty provides certain benefits for nationals of a particular state ... individual rights are

only derivative through the states." (*quoting, United States v. ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975)); *Matta–Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir.1990) (in response to allegation that abduction violated extradition treaty the court held that "[i]t is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereign involved."); *United States v. Cordero*, 668 F.2d 32, 38 (1st Cir.1981) (in response to allegation that abduction violated extradition treaty the court held that "it is the contracting foreign government, not the defendant that would have the right to complain about a violation"); Restatement § 432 R.N. 3 ("Under prevailing practice, ... states ordinarily refrain from trying persons illegally brought from another state only if that state demands the person's return."). According to this line of authority, only the sovereign may raise a claim that the method of securing a person's presence violates the procedures of an extradition treaty.

#### b. distinguished from standing to raise the "doctrine of specialty"

▮ The precise standing issue in the present case must be distinguished from the issue of who has standing to invoke the "doctrine of specialty" because some courts have held that either the state *or* the individual may raise the "doctrine of specialty." The doctrine of specialty prohibits the requesting nation from prosecuting an extradited individual for any offense other than that for which the extraditing state agreed to extradite. *United States v. Rauscher*, 119 U.S. 407, 430, 7 S.Ct. 234, 246, 30 L.Ed. 425 (1886); *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). The doctrine addresses only the permissible *scope of prosecution* of a person brought to this country through extradition proceedings, rather than the permissibility under the treaty of

---

**11.** Moreover, Congress has enacted legislation providing that extradition is to be undertaken by virtue of a treaty and subject to judicial proceedings in federal district court in accordance with the provisions of the statute. 18 U.S.C. § 3181 *et seq.* (1948).

the means by which a person's presence is secured.

There is a split in the circuits as to whether an individual has standing to raise the doctrine of specialty with regard to an extradition. *Leighnor v. Turner*, 884 F.2d 385 (8th Cir.1989) (collecting cases). While the Ninth Circuit has held that an extradited individual may raise this doctrine, *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986), it is difficult to discern the basis for this holding.[12] It may be argued that by affirmatively undertaking extradition proceedings and limiting the scope of prosecution by the receiving state, the sending state implicitly protests prosecution on any bases not specified by the bill of extradition. This implicit protest thereby vests the individual with the sending state's rights and standing in that regard.

■ Dr. Machain's claim would not appear to fall within the confines of the doctrine of specialty nor the rationale for individual standing. Dr. Machain is not asserting that he is being prosecuted for a crime other than that to which Mexico agreed during the extradition proceedings. Indeed, no extradition proceedings have occurred which might be construed as an implicit protest to Dr. Machain's prosecution for the crimes charged. Rather, Dr. Machain claims that the method of his abduction violated the extradition treaty between the United States and Mexico by unilaterally bypassing the extradition procedures altogether. Under these circumstances, there is no act by the sending state which can be construed as an implicit protest. This Court holds that its is for the state, and not the individual, to initially protest and thereby raise a claim that the method of securing a person's presence violates an extradition treaty. The individual's standing to raise this claim is purely derivative of that of the state.

c. Mexico has expressly and adequately protested and thereby vested Dr. Machain with its rights under the extradition treaty

Little authority exists as to what constitutes a protest by a sovereign for the purpose of raising a treaty violation in federal court.[13] In *Gengler*, the Second Circuit stated that to support such a claim, a defendant would have to prove the sovereign "registered an official protest with the United States Department of State." 510 F.2d at 67 n. 8; *see also, Matta–Ballesteros ex rel. Stolar v. Henman*, 896 F.2d 255, 260 (7th Cir.1990) (requiring "an official protest").

■ The Embassy of Mexico has presented a diplomatic note to the United States Department of State in Washington, D.C. concluding that U.S. agents violated the terms of the extradition treaty by unilaterally abducting Dr. Machain, and demanding Dr. Machain's return to Mexico. Mexico has adequately protested and raised any rights it has under the extradition treaty in force between the United States and Mexico. Accordingly, Dr. Machain has derivative standing to invoke those rights. The legality of Dr. Machain's abduction

---

12. The *Najohn* court cited *Rauscher* for this proposition. While the *Rauscher* Court spoke of "the right conferred upon persons brought from a foreign country into this under [extradition] proceedings," 119 U.S. at 424, 7 S.Ct. at 243, in *Rauscher* there had already been a protest by the government of Britain to Rauscher's prosecution. *See, Ford v. United States*, 273 U.S. at 615, 47 S.Ct. at 538 (*Rauscher* "was decided at the end of a prolonged controversy between Great Britain and the United States, through their State Departments"); *see also, United States v. Kaufman*, 858 F.2d 994, 1009 (5th Cir. 1988) (noting same and concluding that in *Rauscher* the sovereign had invoked its rights). Thus in *Rauscher*, the individual defendant had *derivative* standing because the sovereign pro-

tested under the treaty and thereby vested the individual with standing to invoke its rights.

13. Counsel for Dr. Machain has submitted a stipulation signed by the parties which reads: "It is hereby stipulated, by and between the United States Attorney, and defendant Humberto Alvarez Machain [sic], by and through his counsel, Robert K. Steinberg, that the Mexican Government has objected to the circumstances of the apprehension of defendant Alvarez–Machain in Mexico." The fact that the parties have stipulated that the Government of Mexico has "objected" does not make it so, nor confer derivative standing upon defendant.

under the extradition treaty is therefore squarely before the Court.

### C. The United States' Participation in the Abduction of Dr. Machain Violated the Extradition Treaty

■ In opposition to this motion, the government makes two arguments why the United States has not violated the terms of the extradition treaty. First, the government argues that it did not violate the treaty because United States personnel did not personally participate in the abduction in Mexico. Second, the government argues that, even if the United States is chargeable with the conduct of the Mexican abductors, there has been no violation of the extradition treaty because there has been no formal extradition. Neither of these arguments is tenable. The United States is responsible for the actions of its paid agents, and a unilateral abduction by the United States when combined with an official protest from the government of Mexico constitutes a violation of the extradition treaty between these two sovereigns.

### 1. State responsibility

The record reveals that the DEA and its informants were integrally involved in Dr. Machain's abduction. Prior to the kidnapping, the DEA induced the abductors with the offer to pay a $50,000 reward for the successful abduction of Dr. Machain and promised to reimburse these individuals for their expenses. These promises were communicated to the abductors prior to the abduction. The DEA gave the go ahead for the abduction. This command was approved at the highest levels of the DEA. The United States Attorney General's office appears to have been consulted. Upon completion of the abduction, the DEA paid a $20,000 reward to the abductors and their families. In addition, many of the abductors and their families have been relocated to the United States. The United States pays approximately $6,000 per week in living expenses for the relocated abductors.

> [I]t is clear that state responsibility attaches to acts committed by agents of a state or by private individuals acting on behalf of the state. In the latter instance, the type of connection which must be established between the individual (acting privately) and the state (in order to impute that individual's act to the state) is not very clear.... There is, however, no ambiguity in cases where the state, through its agents, incited, encouraged or induced private individuals to undertake such actions with a view to benefit from its outcome.

1 Bassiouni, Ch. 5, § 5.2, p. 216; *compare, United States v. Lovato,* 520 F.2d 1270, 1271 (9th Cir.) (per curiam), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975) (state responsible under exception to *Ker–Frisbie* doctrine for "barbarities inflicted ... by persons who can be characterized as paid agents of the United States."). Therefore, the United States may be charged with the acts of Dr. Machain's abductors.

### 2. Violation of the Extradition Treaty

The government argues that there has been no violation of the extradition treaty where the United States unilaterally abducted a Mexican national from Mexican territory, because there have been no formal extradition proceedings in this case. As a basis for this contention, the government relies on the settled principle that an extradition treaty does not "purport to describe the procedural requirements for extradition incumbent upon the rendering state." *Najohn,* 785 F.2d at 1422. *See also, Cordero,* 668 F.2d at 38 ("To hold that extradition treaties *forbid* foreign nationals to return criminal defendants except in accordance with the formal procedures they contain, would ... represent a novel interpretation of those treaties.").

■ This principle, however, and the cases cited by the government (discussed below), do not hold, nor suggest, that an extradition treaty does not limit the permissible procedures that may be employed by the receiving state. Like all treaties, extradition treaties "[are] designed to protect the sovereignty and territorial integrity of states, and to restrict impermissible state conduct." Bassiouni, Ch. 5, § 2, p. 194. As early as *Rauscher* (1886), the Supreme

Court recognized that extradition treaties exist to protect the sovereignty of the contracting states.[14]

While in *Rauscher* the Court was primarily concerned with the development of the doctrine of specialty as "an appropriate adjunct" to the principles of territorial sovereignty embodied in a treaty of extradition, the Court also concluded that these principles, and the treaty, limit the means by which a state may obtain jurisdiction over an individual located in the territory of the other contracting state. Thus, the *Rauscher* Court concluded that where an extradition treaty is in place, an individual "can only be taken under a very limited form of procedure. . . ." *Rauscher*, 119 U.S. at 421, 7 S.Ct. at 241.[15]

The government's contention in the present case that a state violates an extradition treaty when it prosecutes for a crime other than that for which the individual was extradited (the doctrine of specialty), but not when a state unilaterally flouts the procedures of the extradition treaty altogether and abducts an individual for prosecution on whatever crimes it chooses, is absurd. It is axiomatic that the United States or Mexico violates its contracting partner's sovereignty, and the extradition treaty, when it unilaterally abducts a person from the territory of its contracting partner without the participation of or authorization from the contracting partner where the offended state registers an official protest.[16]

The cases cited by the government do not instruct otherwise.

### a. *Ker v. State of Illinois*

The government attempts to rely upon *Ker v. State of Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) (decided the same day as *Rauscher*) as a basis for asserting that there has been no violation of the extradition treaty in the present case. *Ker* provides no support for this proposition.

In *Ker*, an American private detective named Henry Julian, while in Peru, received duly executed extradition papers from the United States government which conformed to the requirements of the extradition treaty between the United States and Peru. Julian was instructed to serve these papers upon the Peruvian government to begin the extradition process. Julian failed to use these papers because the proper government of Peru was inaccessible as a result of military occupation of the capital by Chilean forces. Rather than use these papers, the detective, with the assistance of the occupying Chilean forces, forced Ker to board a vessel bound for the United States. At no time did the Peruvian government object to this procedure.

14. [A]ccording to the doctrine of publicists and writers on international law, the country receiving the offender against its laws from another country had no right to proceed against him for any other offense than that for which he had been delivered up. This is a principle which commends itself, as an appropriate adjunct, to the discretionary exercise of the power of rendition, because it can hardly be supposed that a government which was under no treaty obligation, nor any absolute obligation of public duty, to seize a person who had found asylum within its bosom, and turn him over to another country for trial, would be willing to do this, unless a case was made of some specific offense, of a character which justified the government in depriving the party of his asylum. . . . It is very clear that this treaty did not intend to depart in this respect from the recognized public law which had prevailed in the absence of treaties. . . . This is not only apparent from the general principle that the specific enumeration of things implies the exclusion of all others, but

the entire face of the treaty, including the processes by which it is to be carried into effect, confirms this view of the subject. *Rauscher*, 119 U.S. at 419–420, 7 S.Ct. at 240–41.

15. Further, in concluding that extradition treaties should be construed as protecting the territorial integrity and sovereignty of the contracting states, the court reasoned that "This is not only apparent from the general principle that the specific enumeration of things implies the exclusion of all others, but the entire face of the treaty, *including the processes by which it is to be carried into effect*, confirms this view of the subject." *Rauscher*, 119 U.S. at 419–420, 7 S.Ct. at 241 (emphasis added).

16. *Cf. Toscanino*, 500 F.2d at 277 (finding that state-sponsored kidnapping as alleged violated the territorial integrity of the sovereign and thereby violated provisions of the Charter of the United Nations and the Charter of the Organization of American States).

Ker challenged the state court's jurisdiction on two grounds. First, Ker objected to his forcible abduction on due process grounds. The Court rejected his due process objection and this holding formed the basis of the *Ker–Frisbie* doctrine. Second, *Ker* claimed that his abduction violated the existing extradition treaty between the United States and Peru. The Court denied Ker's second claim finding that there was no violation of the treaty because there was no state action by the United States. The Court stated:

> In this case before us, the plea shows that, although Julian went to Peru with the necessary papers to procure the extradition of Ker under the treaty, those papers remained in his pocket, and were never brought to light in Peru; that no steps were taken under them; and that Julian, in seizing upon the person of Ker, and carrying him out of the territory of Peru into the United States, did not act, nor profess to act, under the treaty. In fact, the treaty was not called into operation, was not relied upon, was not made the pretext of the arrest, and *the facts show that it was a clear case of kidnapping within the dominions of Peru, without any pretense of authority under the treaty or from the government of the United States.*

*Id.* at 442–43 (emphasis added). In this context, the United States owed Peru no duty under the extradition treaty with regard to the kidnapping because the kidnapping could not be construed as the act of the United States, and therefore there had been no extradition.[17] The extradition treaty simply had no bearing on the acts of

Julian as an individual, and therefore had no application to the facts of the abduction.

Therefore, *Ker* has no bearing on the present case.[18]

### b. cases involving consent or acquiescence of the rendering state

The government also attempts to rely upon cases involving either a joint effort by the contracting states or some other form of consent to the abduction by the rendering state. In these situations, there is no violation of the treaty because there is no affront to the rendering state's sovereignty. These cases do not apply to the instant case where there has been neither a joint effort nor consent from the Mexican government, and indeed the Mexican government has registered an official protest against the United States' acts.

In *Cordero*, 668 F.2d 32 (1st Cir.1981) for example, the defendants were arrested in Panama by Panamanian officials, sent by air to Venezuela, and then to Puerto Rico where they were convicted of various drug-related charges. In rejecting the defendants' claim that this procedure violated the extradition treaties between the United States and Panama and Venezuela, the First Circuit held that "[n]othing in the treaty prevents a sovereign nation [Panama or Venezuela] from deporting foreign nationals for other reasons and in other ways should it wish to do so." *Id.* at 37. The Court found "no basis for any inference that either Panama or Venezuela objected to the appellants' departure from their territories. To the contrary, it was Panamanian and Venezuelan authorities who deported them." *Id.* at 38.

---

17. Peru could however seek extradition of Julian to Peru to stand trial for the kidnapping. 119 U.S. at 444, 7 S.Ct. at 229.

18. The government also cites *Ex Parte Lopez*, 6 F.Supp. 342 (S.D.Tex.1934), a case which relies on *Ker*. *Lopez* involved facts similar to those in the present case. In *Lopez*, defendant, a Mexican national, was seized in Nuevo Laredo in Mexico by four men, and forcibly brought into the United States where he was arrested by a U.S. Marshall. The abductors appear to have been Mexican nationals. The court indicated that Mexico had protested the abduction. The court did not indicate whether the defendant

based his claim for relief on the due process clause, an extradition treaty, or both. The court's entire analysis of defendant's claim, whatever it may have been, consisted of the following statement: "The cases are practically all one way that petitioner may not, under such circumstances, be discharged in a habeas corpus proceeding." *Id.* at 344. The court cited *Ker*. To the extent that the *Ex Parte Lopez* court relied upon *Ker* as holding that unilateral forcible abduction may not violate an extradition treaty, *Ex Parte Lopez* was wrongly decided for the reasons discussed in the body of this opinion.

Similarly, in *United States v. Valot*, 625 F.2d 308 (9th Cir.1980) a U.S. warrant was issued for the arrest of the defendant who had violated the terms of parole by traveling to Asia. Valot was arrested in Thailand by Thai authorities, and eventually escorted to the Bangkok airport by Thai immigration officials where he was received by DEA agents and flown to the United States. *Id.* at 309. Since Thai officials aided in Valot's removal to the United States, the court held that the extradition treaty was not violated. *Id.* at 310. "[W]here no demand for extradition is made by the United States and the defendant is deported by the authorities of the other country which is party to the treaty, no 'extradition' has occurred and failure to comply with the extradition treaty does not bar prosecution." *Id. See also, Lovato,* 520 F.2d at 1272 (no violation of extradition treaty as a result of "routine expulsion by Mexican officials of an undesirable alien"); *Stevenson v. United States,* 381 F.2d 142, 144 (9th Cir.1967) (no violation of extradition treaty where defendants were deported by Mexican immigration officials); *United States v. Herrera,* 504 F.2d 859 (5th Cir.1974) (no violation of extradition treaty where defendant was deported from Peru to the United States by Peruvian officials and United States officials); *Matta–Ballesteros,* 896 F.2d at 261 (no violation of extradition treaty as a result of joint abduction by U.S. agents and Honduran agents where Honduran government did not protest abduction); *United States v. Sobell,* 244 F.2d 520 (2d Cir.), *cert. denied,* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).[19]

 In the present case, there has been no joint effort by the United States and Mexico. The record reveals no participation in the abduction by the Mexican government. Rather, the record reveals that earlier negotiations between the United States and known representatives of Mexico for an exchange of fugitives had broken down. When Mexico attempted to revive those negotiations, the United States refused. The United States then unilaterally proceeded with the abduction without the knowledge or participation of the Mexican government.

The fact that two of the abductors appear to have been active Mexican police officers is of no consequence. They were clearly acting outside the scope of their authority. The government of Mexico has indicated that they violated the Mexican constitution and the extradition treaty. *Compare, Ker,* 119 U.S. at 443, 7 S.Ct. at 229 (the acts of Julian were "without any pretense of authority under the treaty or from the government of the United States."). The Mexican government has arrested its citizens who participated in those acts, and has requested extradition of Berrellez and Garate for prosecution in Mexico for kidnapping. Finally, the government of Mexico has formally protested these acts to the United States Department of State and has indicated that

**19.** In *Sobell,* the appellant (Sobell) alleged that he was abducted from Mexico by Mexican Security Police acting as agent of the United States F.B.I., and delivered to U.S. agents at the United States border. The Second Circuit concluded that "Appellant was deported from Mexico." *Id.* at 523. There was no protest filed by Mexico. In reaching its conclusion that the extradition treaty had not been violated, the Second Circuit did not rely upon the joint participation of the Mexican officials, nor the failure of Mexico to protest to the abduction. Inexplicably, the Second Circuit based its ruling upon a finding that there was no state responsibility on the part of the United States for the acts of the Mexican Secret Police who were presumed for the purposes of the motion to be "agents" of the F.B.I. The Second Circuit court rejected Sobell's contention that, "The acts of the United States agents in initiating, planning and participating in the seizure" would impose state responsibility on the United States. *Id.* at 525. The court held that "it can hardly be maintained, still assuming the truth of appellant's charges, that the unlawful and unauthorized acts of the Mexican police acting in behalf of subordinate agents of the executive branch of the United States Government were any more the acts of the United States than the unlawful and unauthorized acts of the emissary of the Chief Executive [in *Ker* ]. We think that the question presented in indistinguishable from that before the Supreme Court in *Ker,* and that our decision here is controlled by that case." *Id.* The Court questions what formulation of state responsibility the *Sobell* court was applying. In any event, as discussed earlier in this opinion, in the present case the Court finds that the United States is chargeable with the acts of its paid agents, Garate's associates.

they endanger the binational efforts of the United States and Mexico in the fight against drug trafficking.

Nor can the United States complain that it was mislead into believing that Garate's associates acted under the authority of the Mexican government. Unlike his testimony with regard to Castillo, agent Berrellez testified that he did not know whether Garate's associates were acting under the authority of the Mexican government. Apparently this was not a crucial consideration.

The remaining cases cited by the government are inapposite because, although they did not involve joint abductions, the rendering state did not register a protest to the abduction. Courts have held that where the offended state fails to register a protest to an abduction, that state acquiesces to the unilateral act of the receiving state, and there is no violation of international law. In *United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) for example, DEA agents hired an individual to lure Lugan from Argentina by posing as a business man who needed Lugan (a pilot) to fly him to Bolivia. In Bolivia, Lugan was "promptly taken into custody by Bolivian police who were not acting at the direction of their own superiors or government, but as paid agents of the United States." *Id.* at 63. The Bolivians, acting together with American agents, then placed Lugan on a plane heading for New York. *Id.* The court held that "the failure of Bolivia or Argentina to object to Lugan's abduction would seem to preclude any violation of international law which might otherwise have occurred." *Id.* at 67. *See also, United States v. Toro*, 840 F.2d 1221, 1235 (5th Cir.1988) (no violation

of extradition treaty when DEA agents removed individual from Panama without complying with extradition procedures where "neither party to the treaty has objected to de la Pava's extradition"); *United States v. Reed*, 639 F.2d 896 (2d Cir.1981) (no violation of extradition treaty where Bahamian government did not seek the return of defendant and did not protest abduction).

The present case is distinguished from those cited by the government because there is no indication that Mexico has participated in or consented to this abduction, and Mexico has registered a protest to this abduction. The Court notes that the Ninth Circuit has consistently chosen language which preserves this distinction. In *Najohn*, the Ninth Circuit noted that "the surrender of the defendant [under an extradition treaty] requires the cooperation of the surrendering state" and that an extradition treaty does not "purport to describe the procedural requirements for extradition incumbent upon the *rendering* state." 785 F.2d at 1422 (emphasis added). In *Stevenson* the Ninth Circuit held that "[w]hile the formalities of extradition may be waived by *the parties* to the treaty, a demand in some form by one country upon the other is required, in order to distinguish extradition from the unilateral act of one country, for its own purposes, *deporting* or otherwise unilaterally *removing* unwelcome aliens." 381 F.2d at 144 (emphasis added). In *Valot*, the Ninth Circuit held that "where no demand for extradition is made by the United States and the defendant is *deported* by the authorities of the other country which is a party to the treaty, no 'extradition' has occurred and failure to comply with the treaty does not bar prosecution." 625 F.2d at 310 (emphasis added).[20]

**20.** Similarly, the Court in *Ker*, 119 U.S. 436, 7 S.Ct. 225, wrote:

[It cannot] be doubted that the government of Peru could, of its own accord, without any demand from the United States, have surrendered *Ker* to an agent of the state of Illinois, and that such surrender would have been valid within the dominions of Peru.... The right of the government of Peru voluntarily to give a party in Ker's condition an asylum in that country is quite a different thing from

the right in him [Ker] to demand and insist upon security in such an asylum. The treaty, so far as it regulates [Ker's] right of asylum at all, is intended to limit this right in the case of one who is proved to be a criminal fleeing from justice; so that, on proper demand and proceedings had therein, the government of the country of the asylum shall deliver him up to the country where the crime was committed. And *to this extent, and to this alone, the treaty does regulate or impose a restriction*

In the present case, the United States acted unilaterally, without the participation or consent of the Mexican Government, and the Mexican government has registered an official protest to these actions. Given these facts, the United States has violated the extradition treaty between the United States and Mexico.

## C. Remedy

 Under international law, a state that has violated an international obligation to another state is required to terminate the violation and make reparation to the offended state. Restatement § 901. "[T]he reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed." Restatement § 901 R.N. 3.

In *Toscanino*, the second Circuit applied this principle to an abduction similar to that in the present case. There, the Second Circuit recognized "a long standing principle of international law that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped." *Toscanino*, 500 F.2d at 278; *see also*, 1 Bassiouni, Ch. 5, § 5.4, p. 235. Similarly, in *Rauscher*, the Court held that where a receiving state seeks to prosecute an individual for crimes other than those for which she or he was extradited, the receiving state must first afford the individual an opportunity to return to the country from which he or she was received, or be in violation of the treaty. 119 U.S. at 430, 7 S.Ct. at 246.

The remedy in the present case is the immediate return of Dr. Machain to the territory of Mexico. Accordingly, the United States is hereby ordered to return him to the territory of Mexico.

## III. The Charter of the United Nations and Charter of the Organization of American States

Dr. Machain attempts to invoke provisions of the Charter of the United Nations [21] and Charter of the Organization of American States.[22] He argues that his abduction by paid agents of the United States violates these international instruments and warrants dismissal of the indictment. The Court need not reach these issues in light of its holding with regard to the extradition treaty. The Court notes however, that while the United States' participation in the abduction of Dr. Machain would appear to violate these international instruments,[23] the weight of authority indicates that these international instruments are not self-executing and therefore are not enforceable in federal courts absent implementing legislation.[24] Dr. Machain has

---

> upon the right of the government of the country of the asylum to protect the criminal from removal therefrom.

*Id.* at 442, 7 S.Ct. at 228 (emphasis added). The Court simply then went on to hold that the United States had not participated in Ker's abduction and therefore there had been no violation of the treaty. Under these circumstances, the United States owed Peru no duty with regard to the abduction of Ker by Julian, though Peru could seek extradition of Julian from the United States. *Id.* at 444, 7 S.Ct. at 229.

**21.** The U.N. Charter obligates "All members" to "refrain ... from the threat or use of force against the territorial integrity of political independence of any state." U.N. Charter, June 26, 1945, 59 Stat. 1031, T.S. 993, art. 2 para. 4.

**22.** The O.A.S. Charter provides that the "territory of a state is inviolable; it may not be the object, even temporarily ... of ... measures of force taken by another state, directly or indirectly, on any grounds whatever...." O.A.S.

Charter, April 30, 1948, 2 U.S.T. 2394, TIAS No. 2361, as amended by the Protocol of Buenos Aires, February 27, 1967, 21 U.S.T. 607, TIAS No. 6847, art. 20[17].

**23.** *See Toscanino*, 500 F.2d at 277.

**24.** *See, Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 374 n. 5 (7th Cir.1985) (U.N. Charter provisions not self-executing); *Spiess v. C. Itoh & Co. (America) Inc.*, 643 F.2d 353, 363 (5th Cir.1981), *vacated on other grounds*, 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982) (U.N. Charter not self-executing); *People of Saipan, By and Through Guerrero v. U.S. Dept. of Interior*, 502 F.2d 90, 102 (9th Cir.1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975) (Trask, J., concurring) (U.N. Charter not self-executing); *Hitai v. Immigration and Naturalization Service*, 343 F.2d 466, 468 (2d Cir.) *cert. denied*, 382 U.S. 816, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965) (provision of U.N. Charter not self-executing and does not

failed to cite authority to the contrary.[25]

## IV. Supervisory Power

Finally, Dr. Machain seeks dismissal of the indictment under the Court's supervisory power.

■ A court must not allow itself to be made an "accomplice[ ] in willful disobedience of law." *McNabb v. United States,* 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943). Guided by considerations of justice, a court may exercise it's supervisory power as necessary to preserve judicial integrity and deter illegal conduct. *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). This Court takes note that Dr. Machain is but one of three defendants named in this indictment, or in preceding indictments in this case, to be brought before this Court by forcible abduction from his homeland.

Today, this Court need not rest its decision upon its supervisory power, and does not do so. However, the Court admonishes the DEA to heed Judge Oakes' warning made fifteen years ago, which this Court now adopts: "[W]e can reach a time when in the interest of establishing and maintaining civilized standards of procedure and evidence, we may wish to bar jurisdiction in an abduction case as a matter not of constitutional law but in the exercise of our supervisory power.... To my mind the Government in its laudable interest of stopping the international drug traffic is by these repeated abductions inviting exercise of that supervisory power in the interest of the greater good of preserving respect for the law." *United States v. Lira,* 515 F.2d 68, 73 (2d Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975) (Oakes, J., concurring).

### IT IS SO ORDERED.

invalidate provision of immigration law); *Vlissidis v. Anadell,* 262 F.2d 398, 400 (7th Cir.1959) (U.N. Charter does not supercede quota system of United States immigration law); *Manybeads v. United States,* 730 F.Supp. 1515, 1521 (D.Ariz. 1989) (U.N. Charter not self-executing); *Pauling v. McElroy,* 164 F.Supp. 390, 393 (D.D.C.1958), *aff'd,* 278 F.2d 252 (D.C.Cir.) (per curiam), *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960) (U.N. Charter not self-executing)); *Camacho v. Rogers,* 199 F.Supp. 155, 158 (S.D.N.Y. 1961) (provisions of U.N. Charter not self-executing); *Sei Fujii v. California,* 38 Cal.2d 718, 722–25, 242 P.2d 617 (1952) (U.N. Charter not self-executing); *In re Alien Children Ed. Litigation,* 501 F.Supp. 544, 590 (S.D.Tex.1980) (Article 47 of O.A.S. Charter not self-executing); *Filartiga v. Pena–Irala,* 630 F.2d 876, 882 n. 9 (2d Cir.1980) (O.A.S. Charter not self-executing) (dicta); *Doe v. Plyler,* 628 F.2d 448, 453 (5th Cir.1980) (Protocol of Buenos Aires not self-executing) (dicta).

Other courts have held that these instruments are not "self-executing" in the sense that they do not confer judicially enforceable rights upon individuals. *See e.g., Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 809 (D.C.Cir.), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1984) (Bork, J., concurring) (U.N. Charter not "self-executing").

**25.** While defendant may attempt to rely upon *Toscanino,* 500 F.2d 267 (2d Cir.1974), a close reading of that decision reveals that it is inapposite. While the *Toscanino* court found that the defendant had alleged acts by the U.S. government that would constitute violations of the U.N. and O.A.S. Charters if shown to be true, that court did not hold that these international

agreements were controlling law enforceable in federal court. Rather, the Second Circuit examined these international instruments as evidence of *principles* of international law (as opposed to international agreements). In this capacity, the Charters were relevant to assist the court in determining whether the government's conduct might violate a defendant's rights protected by principles of customary international law and might warrant an exercise of that court's supervisory powers. *Id.* at 276–79. In *Filartiga,* the Second Circuit explained its earlier holding in *Toscanino:*

> We observe that this Court has previously utilized the U.N. Charter and the Charter of the Organization of American States, another *non-self-executing* agreement, as evidence of binding principles of international law. *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974). In that case, our government's duty under international law to refrain from kidnapping a criminal defendant from within the borders of another nation, where formal extradition procedures existed, infringed the personal rights of the defendant, whose international law claims were thereupon remanded for a hearing in the district court.

*Filartiga,* 630 F.2d at 882 n. 9 (emphasis added). To the extent that these Second Circuit cases suggest that principles of international law may provide a defendant substantive rights in federal court, this proposition has been rejected by the Ninth Circuit. *United States v. Davis,* 905 F.2d 245, 248 n. 1 (9th Cir.1990) ("International law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts.").

It is further Ordered that the Clerk of the Court shall serve, by United States mail, copies of this Order on counsel for the parties in this matter.